HUGHES RIVER WATERSHED CONSERVANCY, an unincorporated association; Sierra Club, a corporation; West Virginia Rivers Coalition, a corporation; Russell Richards; Wilson Lewis Davis; Jettie B. Stanley; Ted Richards, Plaintiffs–Appellants,

and

West Virginia Citizen Action Group, a corporation, Plaintiff,

v.

Paul W. JOHNSON, in his official capacity as Chief Administrator of the Soil Conservation Service, United States Department of Agriculture; Arthur E. Williams, Lieutenant General, in his official capacity as Chief of Engineers, United States Army Corps of Engineers; Joe N. Ballard, Chief of Engineers, U.S. Army Corps of Engineers; William J. Hartman, State Conservationist, Natural Resources Conservation Service, U.S. Department of Agriculture; Daniel R. Glickman, in his official capacity as Secretary of the United States Department of Agriculture; Charles B. Felton, in his official capacity as Director of the West Virginia Division of Natural Resources; Shelby Vanscoy, Chief of the Board of Supervisors, Little Kanawha Soil Conservation District, Defendants–Appellees,

and

Mike Espy, in his official capacity as Secretary of the United States Department of Agriculture; Rollin Swank, in his official capacity as State Conservationist, Soil Conservation Service, United States Department of Agriculture; John Sims, in his official capacity as Chairman of the Board of Supervisors of the Little Kanawha Soil Conservation District, a political subdivision of the State of West Virginia; James B. Lawrence, in his official capacity as Commissioner of the West Virginia Division of Tourism and Parks; Jesse L. White, Doctor, in his official capacity as Co–Chairman of the Appalachian Regional Commission; Robert L. Bensey, in his official capacity as State Conservationist, Natural Resources Conservation Service, United States Department of Agriculture, Defendants.

No. 98–2134.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 1, 1998.

Decided Jan. 13, 1999.

**ARGUED:** Thomas Roy Michael, Michael & Kupec, Clarksburg, West Virginia, for Appellants. Robert Harris Oakley, United States Department of Justice, Washington, D.C., for Appellees. **ON BRIEF:** Lois J. Schiffer, Assistant Attorney General, Robert L. Klarquist, United States Department of Justice, Washington, D.C.; William D. Wilmoth, United States Attorney, Patrick M. Flatley, Assistant United States Attorney, Wheeling, West Virginia, for federal Appellees; Christopher B. Power, David L. Yaussy, Robinson & McElwee, Charleston, West Virginia, for Appellees Fields and Little Kanawha; Darrell V. McGraw, Jr., Attorney General, Daynus Jividen, Senior Assistant Attorney General, Charleston, West Virginia, for state Appellees.

Before NIEMEYER and HAMILTON, Circuit Judges, and HERLONG, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge NIEMEYER and Judge HERLONG joined.

## OPINION

HAMILTON, Circuit Judge:

The Hughes Rivershed Water Conservancy and a number of other environmental groups (collectively referred to as HRWC) appeal the district court's grant of summary judgment in favor of the Army Corps of Engineers and the Natural Resources Conservation Service (the Agencies), following our remand of the case with instructions to direct the Agencies to fully comply with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–70d (NEPA). *See Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir.1996) (*HRWC I*). For the reasons stated below, we affirm.

### I.

The procedural and factual history of this case are extensively summarized in this court's opinion in *HRWC I. See id.* Accordingly, only a brief synopsis of the facts and procedural history is set forth here.

Starting in 1975, the Agencies drafted a plan to construct a multipurpose dam on the North Fork of the Hughes River, thereby creating a 305–acre lake in the North Fork area of northwestern West Virginia (the Project). The Agencies, in compliance with NEPA and after conducting a series of public meetings, drafted an environmental impact statement (EIS) with respect to the Project. After the Agencies circulated the draft EIS for public comment, the Sierra Club, the Department of the Interior, and the Environmental Protection Agency (EPA) informed the Agencies that they considered the draft EIS deficient.

In June 1994, the Agencies released a final environmental impact statement (FEIS) that contained the Agencies' responses to the comments received on the draft EIS. One month later, the Agencies issued a record of decision approving the Project. Thereafter, HRWC filed suit challenging the Agencies' decision approving the Project. The parties agreed to stay the Project pending a decision by the district court. The case was submitted to the district court on cross-motions for summary judgment based on the administrative record. The district court granted summary judgment in favor of the Agencies, holding that the EIS was not arbitrary and capricious. HRWC noticed a timely appeal. The district court continued the stay pending appeal.

On appeal, this court held that the Agencies had: (1) violated NEPA by failing to take a sufficient "hard look" at the problem of zebra mussel infestation[1] resulting from the Project before deciding not to prepare a supplemental environmental impact statement (SEIS);[2] and (2) violated NEPA because the EIS's use of an inflated estimate of the Project's economic benefits from recreational use of the Project impaired fair consideration of the Project's adverse environ-

mental effects.[3] *See id.* at 437. Accordingly, this court vacated those parts of the district court's judgment holding the Agencies had not violated NEPA in these respects and instructed the district court on remand to direct the Agencies to reevaluate the Project in light of our holdings. *See id.* at 450. Specifically, this court instructed the Agencies to take a "hard look" at the problem of zebra mussel infestation and to determine, based on that "hard look," whether to prepare a SEIS addressing zebra mussel infestation. *See id.* at 445. Additionally, this court remanded the case for the Agencies to reevaluate the EIS's estimate of recreational benefits based upon net benefits rather than gross benefits. *See id.* at 447. Further, we stated, "[p]ending the [Agencies'] reevaluation of the [P]roject in compliance with NEPA, further construction of the [P]roject is stayed." *Id.* at 450–51.

After this court's remand, the Agencies proceeded to reevaluate the Project by examining the specifically identified issues of potential zebra mussel infestation and projected recreational benefits. Among other things, the Agencies obtained several studies and reports.[4]

1. Zebra mussels are fresh water bivalves that are less than two to three centimeters in length and utilize adhesive threads to attach to other mussels and hard surfaces. Anchored by these adhesive threads, they often live together in very high densities by filtering surrounding water for food. They are considered to be a pest organism because they attach to man-made objects, including water intakes, other organisms, and other mussels. The attachment usually kills the native mussels. Zebra mussels spread rapidly because of their prolific reproduction systems and the ease with which they can be transported to new settlements. They spread by several means, including downstream with current, upstream on boats, on bait buckets, and through other manmade mechanisms. After spreading, if the basic water quality and habitat conditions are suitable, the baby zebra mussels will grow into adults in less than three months.

2. Specifically, this court determined that two phone calls made in response to: (1) information from the EPA, the Forest and Wildlife Service (FWS) and Dr. Richard Neves that zebra mussel infestation of the North Fork of the Hughes River would have "devastating environmental consequences" and (2) evidence from Dr. Neves and five other experts showing that the North Fork of the Hughes River would not become heavily in-

fested without the Project, did not constitute a "hard look." *See HRWC I*, 81 F.3d at 445.

3. Specifically, this court found that Natural Resources Conservation Service's (NRCS) reliance on gross economic recreation benefits was inconsistent with the contract for the study and made it impossible to evaluate the true economic benefit of the Project. *See id.* at 447.

4. Specifically, the Agencies obtained the following:

(1) *A Detailed Analysis of Zebra Mussels (Dreissena polymorpha) and the North Fork Hughes River Watershed Project, Ritchie County, West Virginia*, Andrew C. Miller and Barry S. Payne, Environmental Laboratory, U.S. Army Corps of Engineers Waterways Experiment Station, March 1997 (Miller Study).
(2) *An Analysis of the Zebra Mussel As It Relates to the North Fork Hughes River Watershed Project*, Willard N. Harman, State University of New York, College at Oneonta, May 13, 1997 (Harman Study).
(3) *Trip Report for Alum Creek and Lake & State Park*, Pam Yost, Lynn Shutts, and Ron Wigal, September 1997 (Alum Creek Report).
(4) *Final Report, North Fork Hughes River Recreation Study*, MSES Consultants, Inc., in associa-

Briefly summarized, the results of the studies obtained by the Agencies concluded the following: (1) that zebra mussels are not expected to present a problem to the Project area because the pH and calcium levels in the proposed lake are not expected to be even marginally suitable for the growth of zebra mussels; and (2) that after a more detailed consideration of the Project, including an evaluation of all additional recreational benefits, the change in activity mix, and the consideration of non-use values, the estimated net recreational benefits resulting from the Project amount to $2,577,189 (1996 price base), which supports an overall positive benefit-cost ratio for the Project and, therefore, supports the Project's economic feasibility.

The results of these studies and the Agencies' reconsideration of the Project in light of this court's decision were presented in a draft supplemental environmental impact statement (DSEIS) issued in early November 1997 and circulated for public comment. A locally advertised public meeting was held on November 17, 1997, to receive questions and address concerns about the DSEIS. Notice of the availability of the DSEIS was placed in the Federal Register and copies of it were mailed directly to a number of interested parties. Comments were received, including some from HRWC, and the Agencies responded to the comments.

The final supplemental environmental impact statement (FSEIS), which includes the comments received as a result of the circulation of the DSEIS and the Agencies' responses, was issued in February 1998.[5] Following publication of the FSEIS, the Supplemental Record of Decision (SROD) was issued on March 25, 1998. In the SROD, William J. Hartman of NRCS stated, "Having concluded that neither the zebra mussel nor recreation benefits issue would result in a change in the Recommended Plan for the North Fork Hughes River Watershed Project, I propose to implement the [P]roject as described in the June 1994 FEIS and the July 26, 1994 [record of decision]." (J.A. 738).

Thereafter, the Agencies filed a motion requesting dissolution of the stay that had prohibited construction of the Project pending further study and analysis. HRWC opposed the request, contending that the Agencies still had not complied with NEPA. The district court entered summary judgment for the Agencies, finding that the Agencies had followed this court's instructions on remand and fully complied with NEPA. First, the district court determined that the Agencies' decision regarding the non-impact of zebra mussels was not arbitrary and capricious and was based upon sound scientific studies. Next, the district court found that the economic study commissioned by the Agencies supported the Agencies' conclusion in the FSEIS that the adverse environmental effects were not distorted by the recreational benefits estimated in the FEIS. Accordingly, on July 9, 1998, the district court granted summary judgment for the Agencies and stayed construction of the Project for a period expiring August 8, 1998. This court declined to extend the stay pending appeal but did expedite the appeal.

HRWC noticed a timely appeal. On appeal, HRWC contends that the Agencies' decision to implement the Project was arbitrary and capricious because: (1) HRWC's experts concluded that zebra mussel infestation would result in adverse environmental consequences; and (2) the Agencies did not use the best methodology to calculate the recreational benefits.

## II.

■■■ When reviewing an agency's decision to determine if that decision was arbitrary and capricious, the scope of our review is narrow. Like the district court, we look only to see if there has been a "clear error of judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). An agency's rule would be arbitrary and capricious if the agency relied on factors that Congress has

---

tion with Gannett Fleming, Inc., October 1, 1997 (MSES Study).

5. Of course, to fully understand the Agencies' total disclosure of environmental consequences of the Project, the FSEIS must be viewed together with the original FEIS.

not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its .decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Although our inquiry into the facts is to be searching and careful, this court is not empowered to substitute its judgment for that of the agency. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

### A.

Initially, HRWC contends that the FSEIS's conclusion that the Project did not present an unreasonable risk of zebra mussel infestation was arbitrary and capricious because the Agencies still have not taken a sufficient "hard look" at the problem of zebra mussel. infestation resulting from the Project and have not sufficiently considered the opinions of other experts who have reached conclusions that are contrary to those reached in the FSEIS. We disagree.

In *HRWC I,* we held that the Agencies did not take a sufficient "hard look" at the issue of zebra mussel infestation and therefore, reached an arbitrary and capricious conclusion. *See HRWC I,* 81 F.3d at 445. On remand, the critical issue became what impact, if any, an impoundment imposed on a free-flowing river such as the one proposed in the Project would have with respect to the likelihood of zebra mussel infestation. HRWC alleges that the Agencies still have not taken a sufficient "hard look" at the problem of zebra mussel infestation resulting from the Project.

█ The Supreme Court has held that an agency takes a sufficient "hard look" when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised. *See Marsh,* 490 U.S. at 378–85, 109 S.Ct. 1851. Although an agency should consider the comments of other agencies, it does not necessarily have to defer to them

when it disagrees. *See Roanoke River Basin Ass'n v. Hudson,* 940 F.2d 58, 64(4th Cir.1991). Agencies are entitled to rely on the view of their own experts. *See Sabine River Authority v. Dept. of Interior,* 951 F.2d 669, 678 (5th Cir.1992). As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs. *See HRWC I,* 81 F.3d at 437; *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

█ As instructed by this court, the Agencies carefully examined the potential for zebra mussel infestation in the water impoundment to be created as a result of the Project. Specifically, the Agencies: (1) sponsored two expert studies, the Miller Study and the Harman Study; (2) had Dr. Miller comment on the Harman Study; (3) compiled a report regarding the impact of zebra mussel infestation at another lake with similar conditions to those anticipated at the Project; and (4) drafted comprehensive responses to comments received in response to the circulation of the DSEIS. The Agencies' research led them to conclude that the reproduction and survival of zebra mussels is dependent on water quality. Using recognized scientific models, the Agencies predicted that the pH and calcium levels of the water in the Project's reservoir would be at low enough levels that it would be unlikely to support zebra mussels. However, the Agencies concluded that although an infestation of zebra mussels is unlikely, a monitoring program should be designed to obtain information on zebra mussel density and distribution. Accordingly, the Agencies decided to develop monitoring plan in conjunction with other state and federal agencies that will include analysis of the water quality as well as appropriate controls and precautionary measures.

The Agencies also received a number of comments made in response to the distribution of the DSEIS. These comments called into question the Agencies' conclusions regarding zebra mussels infestation. The record reflects that the Agencies carefully considered and responded to these comments.

The responses detail the Agencies' careful deliberations and analysis. Accordingly, we conclude that the Agencies took a sufficient "hard look" at the issue of zebra mussel infestation in conformity with our earlier instructions on remand and have complied with the requirements of NEPA.

▪ To the extent that HRWC also contends that the Agencies did not take a sufficient "hard look" because the Agencies relied on the Miller Study, we disagree. HRWC maintains that it was unreasonable for the Agencies to rely on the Miller Study because it ignored or evaded four critical points by Dr. Harman.[6] While the Agencies concede that the Miller Study did not address the issues raised by the Harman Study because the Miller Study predated the Harman Study, the Agencies did consider and respond to the additional issues raised by the Harman Study by asking Dr. Miller to address those issues during the notice and comment stage of the DSEIS. Dr. Harman's study may have raised issues that are open to debate among experts, but this fact alone does not render the Agencies' conclusion arbitrary and capricious. In short, the Agencies considered the specific concerns raised by Dr. Harman but simply disagreed and relied on their own expert's conclusion. *See Roanoke River Basin Ass'n,* 940 F.2d 58, 64 (stating that an agency is required only to address specific concerns and explain why it found them unpersuasive). Accordingly, we conclude that the Agencies did not act in an arbitrary and capricious manner by reaching conclusions contrary to the conclusions reached by the Harman Study.

### B.

▪ Next, HRWC contends that the Agencies' conclusion that the Project would have an overall positive benefit-cost ratio was arbitrary and capricious. Specifically, the HRWC contends that the Agencies erred by: (1) not using the proper methodology; (2)

inflating the recreational benefits; and (3) not properly considering non-use values.

▪ NEPA requires agencies to balance a project's economic benefits against that project's environmental effects. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). This court previously held that the Agencies violated NEPA by relying on inflated and misleading economic assumptions regarding the Project's economic benefits. *See HRWC I,* 81 F.3d at 446. This court took issue with the fact that the Agencies' study calculated gross recreation benefits rather than net recreation benefits as required by the study's contract. *Id.* at 446–47. This court determined that the Agencies' incorporation of gross recreation benefits in its EIS was misleading and impaired its duty to insure that it took a "hard look" at the Project's environmental effects. Accordingly, this court instructed that on remand the Agencies were to reevaluate the Project using the appropriate data, *i.e.,* the net recreational benefits.

After remand, as instructed by this court, the Agencies reevaluated the Project's economic benefits as compared to its adverse environmental consequences, and incorporated into its FSEIS a calculation of net recreational benefits, instead of gross recreational benefits. After their recalculation, the Agencies concluded that the Project would have an overall positive benefit-cost ratio.

▪ Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to an agency's decision. *See Baltimore Gas & Electric v. Natural Res. Defense Council,* 462 U.S. 87, 100–01, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Webb v. Gorsuch,* 699 F.2d 157, 160 (4th Cir.1983) (holding that where there is conflicting expert opinion, the agency and not the court is to resolve the conflict); *see also Sierra Club*

---

**6.** Specifically, HRWC believes that the Miller Study is faulty because it ignored: (1) that the proposed reservoir will have increased calcium values, as compared to the free-flowing river, because of the effect of plant metabolism; (2) that pH and calcium values vary with the depth of the water and thus surface water samples are

unreliable; (3) that the best proxy reservoir, Mountwood Park Lake, has conditions that will allow the growth of zebra mussels; and (4) that studies by other experts show that the pH and calcium values predicted for the proposed reservoir will support zebra mussels.

v. *Froehlke*, 816 F.2d 205, 214 (5th Cir.1987) (holding that an academic disagreement among experts is not enough to condemn an otherwise adequate EIS). Further, the mere fact that certain factors in a cost-benefit analysis are generally imprecise or unquantifiable does not render the result inadequate. *See Sierra Club v. Lynn*, 502 F.2d 43, 61 (5th Cir.1974).

On appeal, HRWC claims that the Agencies' calculation of economic recreation benefits was misleading. This argument must be rejected. The Agencies, in making their economic recreational benefits determinations, considered the total number of visitors to the Project, the number of visitors who would be diverted to the Project from existing facilities, the consumer surplus figure, and non-use values.[7] By reevaluating the Project and giving more detailed consideration to all of these factors, the Agencies have fully complied with NEPA consistent with this court's instructions. *See id.* at 61 (holding that NEPA does not require that an agency verify its decisions by "reduction to mathematical absolutes for insertion into a precise formula."). Therefore, we conclude that the Agencies' decision to implement the Project based upon its conclusion that the economic benefits out-weighed the adverse environmental impacts was not arbitrary and capricious. *See Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 (to be arbitrary and capricious an agency's decision must be a clear error of judgment).

### III.

HRWC also contends that the FSEIS is arbitrary and capricious because the Agencies only reevaluated the issues of zebra mussel infestation and recreational benefits and not the entire Project. We have reviewed this contention and find it to be without merit. Accordingly, for the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED.*

---

**7.** A non-use value is the value that a person places on knowing the river exists in its free flowing state and knowing the river will be protected for future generations.