**ROUTE 9 OPPOSITION LEGAL FUND, et al., Plaintiffs,**

v.

**Norman MINETA, Secretary, U.S. Department of Transportation, et al., Defendants.**

**Civil Action No. 3:02–CV–20.**

United States District Court, N.D. West Virginia, Martinsburg Division.

Aug. 2, 2002.

West Virginia Rivers Coalition, the Blue Ridge Center for Environmental Stewardship, and two private individuals (collectively referred to as "the Legal Fund") brought this action against federal and West Virginia officials (collectively referred to as "the Agencies"). The Legal Fund sought judicial review of the decision of the Federal Highway Administration ("FWHA") approving construction of a new 4.6 mile section, dual lane highway ("WV 9"), originating at the Charles Town, West Virginia Bypass and terminating at the West Virginia–Virginia state line. The Legal Fund alleged violations of the National Environmental Policy Act ("NEPA") and Section 4(f). For the following reasons, the Court finds that summary judgment should be granted in favor of the Agencies.

## I. Statement of Facts

The current Route 9 is a winding two-lane minor arterial highway designed for high rate of mobility. It currently extends from Route 522 in Berkeley Springs, West Virginia, to western Loudoun County, Virginia. Due to increasing growth in Jefferson County, West Virginia, the portion of Route 9 in the project area has become less rural and currently contains school bus stops and residences and commercial buildings with driveways and entrances accessing Route 9.[1] Due to the changing nature of Route 9, the roadway has physical and functional deficiencies including inadequate roadway geometrics and intersection configurations, lack of climbing and turning lanes where necessary, and inadequate sight distance at intersections. These deficiencies have resulted in unsafe conditions.[2]

Thomas R. Michael, Clarksburg, WV, Andrea C. Ferster, Washington, DC, for Plaintiffs.

Pamela S. West, U.S. Dept. of Justice, Washington, DC, for Norman Y. Mineta, plaintiff.

Pamela S. West, U.S. Dept. of Justice, Washington, DC, Sheila D. Jones, William G. Malley, Ian Shavitz, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, for Mary Peters, Fred Vankirk, defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BROADWATER, District Judge.

The Route 9 Opposition Legal Fund, the Piedmont Environmental Counsel, the

---

1. By the late 1990s, Jefferson County was one of the fastest growing counties in the Nation with a 17.4% growth rate between the 1990 census and the 2000 census.

2. The number of accidents on Route 9 from 1988–1993 exceeded the statewide average by 86% and from 1994–1999 exceeded the statewide average by 32%.

As a result of the increasing growth in the project area, use of Route 9 has increased, and the road now experiences significant local and regional traffic. The increased traffic has resulted in the roadway not functioning at an acceptable level of service. The increased traffic and the unsafe conditions of Route 9 led the WVDOT to determine that transportation improvement was necessary.

In December 1993, the FWHA issued the Draft EIS/Section 4(f) Analysis for public comment. The DEIS/4(f) analysis considered a number of alternatives, including, the No Action Alternative, the Transportation Management Alternative (an upgrade of Route 9), the Public Transit Alternative (financial inducements for commuters to use existing mass transit and/or providing additional mass transit), the Two–Lane Upgrade Alternative (a new roadway on the existing alignment of Charles Town Pike or on a new alignment that would meet applicable design criteria), the Four–Lane Upgrade Alternative (a new roadway utilizing the existing 2–lane Route 9 and adding two parallel lanes, either following the standard design criteria or as a semi-parkway with a center-planted median under applicable design criteria), and five alternatives to build a new four-lane highway on a new alignment within the study area (Alternatives A, B, C, D, and E).

FHWA issued the Final EIS and Section 4(f) Evaluation in October 2000 for comment. Comments were received from the Route 9 Legal Fund and John Porter. Comments were not received from Nancy Wilson, but she did participate earlier in the administrative process. Piedmont Environmental Council, West Virginia Rivers Coalition, Blue Ridge Center for Environmental Stewardship and Friends of Summit Point did not comment on the DEIS/4(f) or the FEIS/4(f), and they did not participate in the administrative process.

On January 4, 2001, FHWA chose Build Alternative E with mitigation because of the findings under Section 4(f) that: (1) there is no prudent alternative for completing the project that entirely avoids the use of Section 4(f) properties; (2) Alternative E is the prudent and feasible alternative that causes the least harm to Section 4(f) properties; and (3) Alternative E incorporates all possible planning to minimize harm to Section 4(f) resources.

## II. Standard of Review and Applicable Law

■ A court may set aside an agency's decision only if that decision is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2). When reviewing an agency's decision to determine if it was arbitrary and capricious, the scope of review is narrow. *See Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 287 (4th Cir.1999). A court's review is limited to whether "the decision was based upon consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *see also Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■ An agency's decision is arbitrary and capricious when the agency has "relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Hughes River Watershed Conservancy,* 165 F.3d at 287–88 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). This

principle of deference embodied in the Administrative Procedures Act ("APA") is applicable to NEPA claims. *See Hughes River Watershed Conservancy,* 165 F.3d at 289.

## A. NEPA

■ NEPA declares a national policy of protecting and promoting environmental quality. *See* 42 U.S.C. §§ 4321, 4331(a). In implementing this policy, federal agencies are required to follow certain procedures before undertaking projects that will effect the environment, including preparation of an Environmental Impact Statement ("EIS"). *See Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437, 443 (4th Cir.1996). However, NEPA does not mandate that agencies reach a particular substantive result. Instead, NEPA sets forth procedures that agencies must follow. *See id.* (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1845–46, 104 L.Ed.2d 351 (1989); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)). "In other words, '[i]f the adverse environmental effects of ... proposed action[s] are adequately identified and evaluated, [agencies are] not constrained by NEPA from deciding that other values outweigh the environmental costs.'" *Hughes River Watershed Conservancy,* 81 F.3d at 443 (quoting *Robertson,* 490 U.S. at 350, 109 S.Ct. at 1846).

Section 102 of the NEPA requires that an EIS consider "alternatives to the proposed action." *See* 42 U.S.C. § 4332(2)(C)(iii). NEPA regulations further require that an EIS evaluate "all reasonable alternatives" to the action "and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (1996).

■ In evaluating compliance with NEPA, the court's role is to ensure that the agency "made a good faith judgment, after considering all relevant factors, including possible alternatives or mitigative measures." *Coalition for Responsible Reg'l Dev. v. Coleman,* 555 F.2d 398, 400 (4th Cir.1977). The role of the reviewing court is not to make the ultimate decision but to ensure that the agency took a hard look at all relevant factors. *See id.* The content and scope of the discussion of alternatives varies with existing circumstances. *See Druid Hills Civic Assoc., Inc. v. Federal Highway Administration,* 772 F.2d 700, 712–13 (11th Cir.1985) (citing *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d at 430, 436 (5th Cir. 1981)). Consideration need only be given to reasonable alternatives. *See id.* at 713. An EIS "is satisfactory if the treatment of alternatives, when judged against a 'rule of reason,' is sufficient to permit a reasoned choice among various alternatives." *See id.*

## B. Section 4(f), 23 U.S.C. § 138

Under Section 4(f) of the Department of Transportation Act of 1966 and § 138 of the Federal–Aid Highway Act of 1968, the Secretary of Transportation may not authorize use of federal funds to finance construction of highways through historic sites if a "feasible and prudent" alternative route exists. If no such route is available, he may approve the project only if there has been "all possible planning to minimize harm" to the historic site. To implement this policy, the FHWA promulgated regulations. *See* 23 C.F.R. § 771.135 (2001).

The FHWA regulations state that the agency "may not approve the use of land from ... any significant historic site unless a determination is made that: (i)[t]here is no feasible and prudent alternative to the use of land from the proper-

ty; and (ii)[t]he action includes all possible planning to minimize harm to the property resulting from such use." *Id.* at § 771.135(a)(1). If a decision is made that the agency must use a protected site, the FHWA must provide:

> Supporting information [to] demonstrate that there are unique problems or unusual factors involved in the use of alternatives that avoid [the property] or that the cost, social, economic, and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes.

*Id.* at § 771.135(a)(2). Once FHWA determines that "adequate support exists for a section 4(f) determination ... [the] evaluation shall specifically address: (1)[t]he reasons why the alternatives to avoid a section 4(f) property are not feasible and prudent; and (2)[a]ll measures which will be taken to minimize harm ...." *Id.* at § 771.135(a)(2)(j).

■ A court's review of the Secretary's decision is limited to the "arbitrary and capricious standard" articulated in the APA. *See Citizens to Preserve Overton Park, Inc., et al., v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Specifically, in reviewing Section 4(f) claims, the court must (1) determine whether the decision maker "acted within the scope of his authority," (2) determine "that the actual choice made was 'not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" and (3) determine "whether the [agency's action] followed the necessary procedural requirements." *Id* at 415–417, 91 S.Ct. 814.

### III. Discussion

#### A. Plaintiffs' NEPA Claim

The Plaintiffs first argue that the FEIS is inadequate because it failed to consider a true upgrade to the existing two-lane Route 9, by widening shoulders, realigning curves, and adding turn lanes to improve traffic operations and address roadway deficiencies. However, a review of the administrative record in this matter reveals that the Defendants did consider two-lane upgrade alternatives, including the improvements suggested by Plaintiffs, and determined that they would not meet the project purposes and need.

■ The responsibility for defining project purposes and needs rests with FHWA. In this matter, the FHWA has articulated the project purposes in the FEIS and ROD as follows:

> The Purpose of the project is to safely accommodate local and regional travel, and provide adequate system linkage, both now and in the future, in the project corridor. In particular, the project is intended to: (1) provide sufficient capacity to serve the traffic volumes projected for WV Route 9 in the years 2025, in a safe manner and at an acceptable level of service, and (2) support the ongoing efforts of WVDOT to improve safety conditions, reduce congestion, and preserve access for local traffic that will continue to use existing WV Route 9.

*See* FEIS at 1–0, 1–1. The FEIS further defines the needs for the project as follows:

1. Based on past trends and future projected increases in population in Jefferson County, there is a need to provide greater mobility for people, goods and services within the county and to regional destinations.

2. Existing WV Route 9 currently operates at an unacceptable Level of Service ("LOS") and is expected to have a worse LOS by the year 2025.

3. There is a need to improve intersection capacity for the turning movements at six intersections along WV Route 9. These intersections LOS

will continue to worsen in the future with four of the five intersections having turning movements at LOS E or F in the year 2025.

4. Numerous school buses presently use WV Route 9 within the study area. The mix of high volume through traffic, poor sight distance and frequent local school bus stops along the existing highway both increases opportunity for collisions with stopped vehicles and decreases roadway capacity. There is a need to improve safety for local school bus movements.

5. Numerous roadway geometric deficiencies including reverse vertical curves with no tangents, crest vertical curves on horizontal curves, varying pavement and shoulder widths, and insufficient clear zones reduce capacity and safety of the roadway. There is a need to provide greatly improved roadway design in accordance with American Association of State Highway and Transportation Officials (AASHTO) design criteria for the volume of traffic this roadway carries and will carry.

6. Numerous driveways and entrances increase the potential for access conflict accidents. There is a need to provide access control suitable for the existing and projected traffic volumes.

7. Based on an accident rate 32 percent higher than the statewide average, an injury rate 44 percent higher than the statewide average, and a fatality rate 76 percent higher than the statewide average, there is a need to improve traffic safety on WV Route 9 within the study area.

*See* FEIS S-3. The Court must review the project purpose and needs "deferentially" and uphold the objectives "so long as the objectives that the agency chooses are reasonable," and the FHWA has "define[d] goals for its action that fall somewhere within the range of reasonable choices." *See Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195–96 (D.C.Cir. 1991).

 The record before the Court indicates that Defendants undertook an extensive alternatives evaluation process. Defendants considered many alternatives including the No Action Alternative, the Transportation Management Alternative ("TSM") (an upgrade of Route 9), the Public Transit Alternative (financial inducements for commuters to use existing mass transit and/or providing additional mass transit), the Two–Lane Upgrade Alternative (a new roadway on the existing alignment of Charles Town Pike or on a new alignment that would meet applicable design criteria), the Four–Lane Upgrade Alternative (a new roadway utilizing the existing 2–lane Route 9 and adding two parallel lanes, either following the standard design criteria or as a semi-parkway with a center-planted median under applicable design criteria), and five alternatives to build a new four-lane highway on a new alignment within the study area (Alternatives A, B, C, D, and E). The alternatives were evaluated in two stages. The first stage, the Preliminary Alternatives Analysis, involved identifying transportation improvements and assessing from an operational viewpoint whether the project purpose and needs could be met. FEIS at 2–1. The second stage, the Detailed Alternatives Analysis, involved a detailed engineering/environmental impact assessment and public and agency coordination to identify a recommended Preferred Alternative.

During the Preliminary Alternative Analysis stage, the TSM Alternative, the Public Transit Alternative, the Two–Lane

Alternatives, and the Four–Lane Upgrade Alternative were dismissed because they did not meet the project needs of safety and capacity. Additionally, the Four–Lane Upgrade Alternative was dismissed because it would require major grading and the acquisition of significant right-of-way acreage along existing WV Route 9, causing a substantial number of residential and business displacements and severe community disruption. The five four-lane controlled access Build Alternatives were retained for detailed study and evaluation based upon the agencies findings that they satisfied the project needs.

The Plaintiffs claim that their Roadway Rehabilitation Alternative was not addressed by the FWHA. The alternative supported by the Plaintiffs advocates adding turning, climbing and passing lanes, realigning curves and widening shoulders. However, the TSM Alternative and the Two–Lane Upgrade Alternative consisted of the types of improvements advocated by the Plaintiffs. See FEIS 2–2, 2–3, and 2–4. Specifically, the TSM Alternative addressed types of improvements that could be applied to WV Route 9 while maintaining the route as a two-lane road with uncontrolled access such as (1) adding turning lanes to improve intersection capacity; (2) signaling certain intersections to improve traffic flow from side roads; (3) additional roadway signing; (4) roadway repaving; (5) widening and repaving shoulders; and (6) adding climbing lanes where appropriate. FEIS at 2–2. The FHWA determined that neither of these alternatives would allow Route 9 to accommodate future traffic volumes at an acceptable level of service, or would address the safety deficiencies of Route 9. The Court finds that this determination was based upon consideration of the relevant factors and that there has been no clear error of judgment on the part of the agency.

The FHWA's decision that upgrading Route 9 would not meet project purpose and needs was based on WVDOT's forecast of the Peak Hour Traffic volume for Route 9 for the years 2004 and 2005, WVDOT's determination of existing and future LOS' for Route 9, accident rates on Route 9, and the viable improvements that could be made on Route 9. Using this information, FHWA determined that neither of the two-lane alternatives discussed in the FEIS would meet the project needs. Specifically, FHWA concluded that the roadway's capacity, deficient geometry, poor sight distance, and LOS would not be improved significantly, if at all. The FHWA further found that the two-lane alternatives would not eliminate the numerous driveways and entrances along Route 9 that cause access conflict accidents and reduce roadway capacity, which was a need identified by the agency. The Administrative Record demonstrates that FHWA considered the roadway improvements advocated by Plaintiffs, concluded that they did not meet the project needs, and considered all relevant factors as required by the NEPA.

■ The Court further finds that the FHWA adequately considered the secondary and cumulative impacts of the project as required by the NEPA. Federal agencies are required to evaluate the "indirect environmental effects" of a proposed action. See 40 C.F.R. § 1508.25(c). Indirect environmental impacts are those "which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). These types of effects include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate . . . ." *Id.* Cumulative impacts are those that "result from incremental impacts of an action when added to other

past and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. However, an agency is only required to study future impacts that are reasonably foreseeable. *See* 40 C.F.R. § 1508.8(b).

The Administrative Record demonstrates that WVDOT undertook an analysis of potential secondary and cumulative impacts of the project. The FEIS incorporated the Regional Secondary and Cumulative Impact Analysis ("the Regional Analysis") and contained a project-specific secondary and cumulative impact study. *See* AR 575 at 5–1. The study area for the Regional Analysis included U.S. Route 522, WV Route 9 from Route 522 to Route 45, WV Route 9 from Route 45 to Charles Town, and the section that is the subject of this litigation, WV Route 9 from Charles Town to Virginia. *See* AR 575 at 5–1. As stated in the FEIS, the purpose of the Regional Analysis was to "examine probable development trends caused by the construction of the proposed projects, and to determine potential secondary and cumulative impacts to environmental resources as a result of future development." *See id.*

Additionally, an assessment of secondary and cumulative land use growth caused by the WV Route 9 project in the reasonable foreseeable future was conducted through a review of the Jefferson County Zoning and Development Review Ordinance. This ordinance limits commercial and residential development in areas zoned for agricultural use, similar to the land along the route of the Preferred Alternative. Based upon its review of each of the proposed Build Alternatives, WVDOT concluded that some development was reasonably foreseeable in the vicinity of one of the WV 9 interchanges. *See* AR at 5–3, 5–8.

Plaintiffs also argue that the FEIS is inadequate because it did not study the possibility that the project would generate traffic pressures on the connecting two-lane roadway in Virginia, which would place a demand on Virginia to build a multi-lane freeway. Plaintiffs argue that Loudoun County, Virginia's comprehensive plan calls for the retention of Route 9 as a two-lane highway with no plans to build a connecting four-lane route. However, the Court disagrees with the Plaintiffs' argument that the FEIS is inadequate because it does not address this issue. Because the Court agrees with the Defendants that it was not reasonably foreseeable that Virginia would build a multi-lane highway, there was no cumulative or secondary impacts to study.[3]

### B. Plaintiffs' Section 4(f) Claim

Plaintiffs further contend that the FHWA violated Section 4(f) because there were prudent and feasible alternatives to the use of Section 4(f) properties. Specifically, Plaintiffs again assert that this alternative is a modification of existing Route 9 "by adding turning lanes, climbing lanes, intersection improvements, widening and resurfacing shoulders, and straightening curves."

During the Section 4(f) process, Defendants' studies identified 88 historic resources 50 years old or older in the project area. Defendants further noted that the Appalachian National Scenic Trail is located in the project area in the vicinity of Keys Gap, WV, near existing WV Route 9 and crosses WV Route 9 at the WV–VA state line. The trail is protected under Section 4(f) and under Section 138 of the Federal–Aid Highway Act of 1968.

---

**3.** Virginia has never indicated that it intends to build a multi-lane Route 9. In fact, in a letter dated August 5, 1994, Virginia's Department of Transportation stated that Virginia's Six–Year Improvement Program did not include any funding for improvements to the WV Route 9 corridor or for the transition at the state line.

After the identification and study of the protected Section 4(f) resources, Defendants determined that there were three alternatives that would totally avoid the use of all Section 4(f) resources: (1) no-build or no-action alternative, (2) proposed upgrade of WV Route 9 (the TSM Alternative), and (3) the Public Transit Alternative. SOF at ¶ 43. As stated above, none of these alternatives met the project purpose or needs. Therefore, each of these alternatives was rejected by the FHWA.

■ Instead, the FHWA chose the Build E Alternative with mitigation based upon the following Section 4(f) findings:

1. *There is no prudent and alternative for completing this project that entirely avoids the use of Section 4(f) properties.* The No–Build Alternative, TSM Alternative, and Upgrade Alternative all were eliminated from detailed study in the FEIS for failing to meet the purpose and need, and therefore, are not prudent. Alignment shifts outside the project area (e.g., a shift to the north or south) also would not meet the project purpose and need, and therefore, are not prudent.

2. *Alternative E is the prudent and feasible alternative that causes the least harm to Section 4(f) properties.* Alternatives A, B, C, and D all would have distinctly greater impacts on Section 4(f)-protected properties than Alternative E, in terms of number of historic properties impacted and in terms of the overall magnitude of these impacts.

3. *Alternative E incorporates all possible planning to minimize harm to Section 4(f) resources.* Alternative E directly "uses" property from two Section 4(f)-protected resources (Belvedere and Fleetwood). However, it does not require the taking of any historic structures associated with those resources and its impacts on those properties will be mitigated in accordance with the Memorandum of Agreement (MOA) executed under Section 106 of the National Historic Preservation Act (NHPA). In addition, while Alternative E crosses the Appalachian Trail, it has the least harm to the trail of any of the Build Alternatives, and appropriate measures to minimize and mitigate impacts on the trail have been incorporated into Alternative E as recommended by the USDOI [U.S. Department of the Interior].

FHWA's SOF at ¶ 52. FHWA concluded that there was no reasonable and prudent alternative to the use of land from Section 4(f) resources and that the proposed action included all possible planning to minimize harm to the Section 4(f) resources resulting from the project. Based upon the above, the Court concludes that FHWA acted within the scope of its authority and reasonably believed that there was not feasible and prudent alternatives to the use of sites protected by Section 4(f).

The Court further finds that the FHWA's decision was not arbitrary or capricious. The alternative advocated by the Plaintiffs did not meet the project purpose or needs as determined by the FHWA. Because the Court finds that the purpose and needs articulated by the agency are reasonable, the FHWA's conclusion that the upgrade alternative would not meet the needs or purposes was not a clear error in judgment.

Finally, the Court is also satisfied that Defendants have met the third-prong of the *Overton Park* test. The record before the Court does not contain any allegations that the FHWA failed to follow the procedural requirements of Section 4(f) in reaching its January 4, 2001 decision.

Therefore, the Court finds that the FHWA was in full compliance with Section 4(f).

## C. Supplemental EIS

 Plaintiffs' final argument is that the Defendants were required to supplement the EIS to evaluate the alternative of upgrading Route 9 due to significant changes. An agency must supplement a draft or final EIS when "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not [being] evaluated in the EIS." 23 C.F.R. § 771.130(a)(2) (2002). The Fourth Circuit has held that a supplemental EIS is required only when new circumstances "present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990). When reviewing an agency's decision not to supplement an EIS, courts must determine whether the agency took a hard look at the new information or circumstances and whether the agency's decision not to supplement the EIS was "a clear error of judgment." *See Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 (quoting *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814).

 In this instant matter, the Court finds that the agency's decision not to supplement the EIS was not a clear error of judgment. As required by FHWA regulations, two re-evaluations of the DEIS were prepared to determine its adequacy and whether a supplement would be needed. Both times, the FHWA found that the DEIS remained adequate and that no supplemental or revised DEIS was necessary. AR 386 at 7, AR 517 at 8. Furthermore, there was no new information before the agency requiring a supplemental EIS.

First, the Court finds that the Amendment to the Federal Aid Highway Act, cited by Plaintiffs in their Amended Complaint, is not applicable to the project. The Federal Aid Highway Act applies to National Highway System projects, and Route 9 is not part of a National Highway System. *See* 23 U.S.C. § 109(p). The second piece of new information relied upon by Plaintiffs to support their argument that a supplemental EIS was necessary is a 1999 determination by the Keeper of the National Register of Historic Places setting the boundaries of the historic Belvedere and Fleetwood farms in the project area. However, the Court is satisfied that Defendants fully analyzed the impacts of the Preferred Alternative on these historic farms in light of the Keeper's determination and properly determined that a supplemental EIS was not required. In fact, the Preferred Alternative was altered in order to mitigate the impacts on Belvedere and Fleetwood farms.

Finally, the two studies referenced by Plaintiffs in their Amended Complaint did not require FHWA to supplement the DEIS. The Surface Transportation Policy Project Study was cited by the Plaintiffs in their comments on the FEIS. The FHWA reviewed the study and found that it was inapplicable to Jefferson County. Specifically, the FHWA stated that the article addressed urban congestion in 68 large cities and not in suburban and rural areas where population and housing growth are occurring regardless of highway capacity. A.R. 617 at D–37. The Court is satisfied that FHWA took a hard look at this study, found it to be inapplicable, and did not clearly err in its decision not to supplement the EIS based on the study.

As to the second study cited by Plaintiffs in the Amended Complaint, the De-Corla–Souza article, the Court finds that it was not mentioned by Plaintiffs in any comments to the FHWA. Therefore, the Court concurs with Defendants that Plain-

tiffs may not argue that the FHWA should have done a supplemental EIS based on information not brought to its attention before the agency's decision. *See Vermont Yankee Nuclear Power v. Natural Resources Defense Council,* 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978) ("[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes a concern.") (quoting *Portland Cement Assn. v. Ruckelshaus,* 158 U.S.App.D.C. 308, 327, 486 F.2d 375, 394 (1973), cert. denied sub nom. *Portland Cement Corp. v. Administrator, EPA,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)).

### D. Standing

 Finally, Defendants have raised a standing issue as to plaintiffs Piedmont Environmental Council and Blue Ridge Center for Environmental Stewardship. In order to pursue the claims in this action, each Plaintiff must have standing. To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 575, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See id.*

 In the instant matter, the Court finds that plaintiffs Piedmont Environmental Council and Blue Ridge Center for Environmental Stewardship have failed to establish standing. Both Plaintiffs have alleged a general injury that the new highway would have upon its members but have failed to allege a concrete and particularized harm. Moreover, Plaintiff Piedmont has failed to allege which of its members would be injured by the Defendants' action or how they would be injured. Plaintiff Blue Ridge Center does not allege any connection between its activities and Virginia Route 9 nor does it allege how it would be injured by the new WV Route 9. Therefore, the Court finds that these Plaintiffs lack standing and that their claims should be dismissed.

### IV. Conclusion

Based upon the above, the Court finds that the Plaintiffs have failed to show that the Defendants decision was arbitrary and capricious or otherwise contrary to law. It is, therefore, hereby **ORDERED** that:

1. Plaintiffs Piedmont Environmental Council's and Blue Ridge Center for Environmental Stewardship's claims be **DISMISSED** for lack of standing;

2. The Plaintiffs' Motion for Summary Judgment be **DENIED;**

3. The Federal Defendants' Motion for Summary Judgment be **GRANTED;** and

4. Defendant Vankirk's Motion for Summary Judgment be **GRANTED.**

5. This matter be **DISMISSED** and struck from the active docket of this Court.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.