**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROUTE 9 OPPOSITION LEGAL FUND,
An Unincorporated Association;
PIEDMONT ENVIRONMENTAL COUNCIL,
A Virginia Nonprofit Corporation;
WEST VIRGINIA RIVERS COALITION;
NANCY WILSON; JOHN PORTER; BLUE
RIDGE CENTER FOR ENVIRONMENTAL
STEWARDSHIP, A project of the
Robert and Dee Leggett Foundation,
A Virginia Nonprofit Corporation,
                    *Plaintiffs-Appellants,*

                 v.

NORMAN Y. MINETA, SECRETARY,
UNITED STATES DEPARTMENT OF
TRANSPORTATION; MARY PETERS,
Administrator, Federal Highway
Administration; FRED VANKIRK,
Secretary, West Virginia
Department of Transportation,
                    *Defendants-Appellees.*

No. 02-2007

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(CA-02-20)

Argued: May 6, 2003

Decided: September 15, 2003

Before WILKINS, Chief Judge, and WILLIAMS and
GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Andrea Carol Ferster, Washington, D.C., for Appellants. Sheila D. Jones, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.C., Washington, D.C., for Appellees. **ON BRIEF:** Ian A. Shavitz, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.C., Washington, D.C.; Thomas L. Sansonetti, Assistant Attorney General, Andrew C. Mergen, Pamela S. West, Robert H. Oakley, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Several organizations and individuals (collectively, "Appellants") appeal a district court order granting summary judgment to federal and West Virginia highway officials in Appellants' suit challenging the approval of a highway construction project. Finding no reversible error, we affirm.

I.

The project at issue involves the construction of a new 4.6-mile four-lane highway in Jefferson County, West Virginia, extending from Charles Town to the Virginia state line. The proposed highway would be built near existing West Virginia Route 9, a winding two-lane highway constructed in the 1930s. Because of rapid population growth in Jefferson County, the relevant portion of Route 9 has become more developed. Numerous residences and businesses now

have driveways accessing the highway, and there are many school bus stops along the road.

Due to the increased traffic on Route 9, the highway now has physical and functional deficiencies, including inadequate roadway geometrics and intersection configurations, a lack of climbing and turning lanes, and inadequate sight distance at intersections. These deficiencies have resulted in unsafe driving conditions, which are reflected in accident, injury, and fatality rates significantly higher than statewide averages. Further, the increased traffic has prevented Route 9 from functioning at an acceptable level of service (LOS).[1]

For these reasons, the West Virginia Department of Transportation (WVDOT) determined that improvements to Route 9 were necessary and sought federal funding for this purpose. Pursuant to a provision of the National Environmental Policy Act of 1969 (NEPA), *see* 42 U.S.C.A. § 4332(2)(C) (West 1994), and Section 4(f) of the Department of Transportation Act of 1966 ("Section 4(f)"), *see* 49 U.S.C.A. § 303(c) (West 1997), the Federal Highway Administration (FHWA) and WVDOT (collectively, "the Agencies") issued a Draft Environmental Impact Statement and Section 4(f) Evaluation for public comment in December 1993. In October 2000, the Agencies issued a Final Environmental Impact Statement and Section 4(f) Evaluation (FEIS). The FEIS identified a variety of possible alternatives for the project, including a No-Build Alternative (leaving the existing Route 9 unchanged), a Transportation Systems Management (TSM) Alternative (making improvements to the existing two-lane highway, such as adding turning and climbing lanes, widening and repaving shoulders, and installing traffic signals and additional signs), a Public Transit Alternative (making greater use of existing and potential public trans-

---

[1]LOS is a qualitative measure describing operational conditions within a stream of traffic and motorists' perception of those conditions. LOS is expressed in grades of "A" through "F," with "A" reflecting the least congested conditions and "F" the most congested. The appropriate minimum LOS for the type of rural highway at issue here is "C." Based on 1999 data, the LOS on four of the eight relevant segments of Route 9 in the morning peak hour is "C." However, for the other four segments in the morning peak hour and all segments in the afternoon peak hour, the LOS ranges from "D" to "F."

portation options), a Two-Lane Upgrade Alternative (upgrading exist-ing Route 9, likely by constructing a two-lane highway on a new alignment in order to provide adequate stopping sight distance and sufficient road and shoulder width, limit roadway grade and horizon-tal curvature, and improve side road intersections), a Four-Lane Upgrade Alternative (expanding the existing highway to four lanes), and five different Four-Lane Build Alternatives (constructing a new four-lane highway on one of five new alignments).

The FEIS evaluated these alternatives in two stages. First, the Agencies assessed whether each of the alternatives would meet the purpose and needs of the project. This analysis was intended "to determine which preliminary alternatives demonstrated merit to be retained for detailed study and which alternatives should be dismissed from further consideration." J.A. 446. During this stage, the Agencies determined that the No-Build Alternative, the TSM Alternative, the Public Transit Alternative, the Two-Lane Upgrade Alternative, and the Four-Lane Upgrade Alternative should be eliminated from further consideration because, *inter alia*, none of these alternatives would meet the capacity and safety needs of the project. By contrast, the Agencies determined that the five Four-Lane Build Alternatives would meet the capacity and safety needs of the project. Thus, these alternatives and the No-Build Alternative were retained for more detailed study.[2]

The second stage of the alternatives analysis involved a more detailed engineering and environmental impact assessment of the alternatives that were carried forward from the first stage. After ana-lyzing each of the Four-Lane Build Alternatives (Alternatives A-E), the Agencies identified Alternative E as the Preferred Alternative.

The Agencies recognized in the FEIS that Alternative E would involve the acquisition of property from sites protected by Section 4(f).[3]

---

[2]Although the Agencies determined that the No-Build Alternative would not meet the project needs, they carried it forward to the second stage as a baseline for comparing the other alternatives.

[3]Section 4(f) provides that the Secretary of Transportation may approve a project "requiring the use of publicly owned land of a public

However, based on their determination that several of the proposed alternatives would not meet project needs and an analysis showing that all of the Four-Lane Build Alternatives would use land from Section 4(f) properties, the Agencies concluded that (1) there were no prudent alternatives that would entirely avoid the use of Section 4(f) properties, (2) Alternative E was the prudent alternative that least harmed these properties, and (3) Alternative E incorporated all possible planning to minimize harm. In January 2001, FHWA issued a Record of Decision approving the selection of Alternative E based on the findings in the FEIS.

In December 2001, Appellants brought this action, claiming, *inter alia*, that the Agencies had violated NEPA and Section 4(f) by failing to adequately consider two-lane alternatives that would add climbing, passing, and turning lanes; realign curves; improve intersections; and widen and resurface shoulders. Both sides moved for summary judgment. With regard to NEPA, the district court held that the Agencies had adequately considered alternatives involving the upgrading of the existing two-lane highway and had reasonably determined that such alternatives would not meet the capacity and safety needs of the project. Similarly, the court rejected Appellants' Section 4(f) claim, concluding that the Agencies' findings regarding the lack of prudent alternatives and the efforts to minimize harm to Section 4(f) properties were reasonable. The court therefore granted summary judgment to the Agencies.[4]

---

park, recreation area, or wildlife and waterfowl refuge . . . , or land of an historic site . . . only if— (1) there is no prudent and feasible alternative to using that land; and (2) the . . . project includes all possible planning to minimize harm to the [protected site] resulting from the use." 49 U.S.C.A. § 303(c).

[4]The district court also ruled that the Agencies did not err in declining to prepare a supplemental environmental impact statement, and it dismissed the claims of Appellants Piedmont Environmental Council and Blue Ridge Center for Environmental Stewardship for lack of standing. Because Appellants do not challenge these rulings, we do not address them further.

## II.

On appeal, Appellants maintain that the Agencies violated NEPA and Section 4(f) by failing to adequately consider two-lane alternatives to the proposed project. We review the grant of summary judgment to the Agencies de novo. *See Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002), *cert. denied*, 123 S. Ct. 871 (2003). We may overturn the FHWA's decision to approve the project only if that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996). "When reviewing an agency's decision to determine if [it] was arbitrary and capricious, the scope of our review is narrow. Like the district court, we look only to see if there has been a 'clear error of judgment.'" *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287 (4th Cir. 1999) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)). An agency's decision is arbitrary and capricious if the agency

> relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 287-88. "Although our inquiry into the facts is to be searching and careful, this court is not empowered to substitute its judgment for that of the agency." *Id.* at 288.

Under NEPA, a federal agency must take a "hard look" at the environmental consequences of its proposed actions. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action." 40 C.F.R. § 1502.14(a), (d) (2002); *see* 42 U.S.C.A. § 4332(2)(C)(iii). "[F]or alternatives which were eliminated from detailed study," the agency must "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). An alternative may be eliminated from further consideration if it does not meet the purpose and needs of the project. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1067

(9th Cir. 1998); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 198 (D.C. Cir. 1991).

Section 4(f) provides that the Secretary of Transportation may approve a project requiring the use of land from a protected site only if "(1) there is no prudent and feasible alternative to using that land; and (2) the . . . project includes all possible planning to minimize harm to the [site] resulting from the use." 49 U.S.C.A. § 303(c). The Secretary must "determine that there are strong and compelling reasons to reject alternatives to the use of section 4(f) land on the basis that the alternatives are not prudent." *Hickory Neighborhood Def. League v. Skinner*, 910 F.2d 159, 164 (4th Cir. 1990). The Secretary may reject alternatives as imprudent when they "would not fulfill the transportation needs of the project." *Id.*

## A.

Appellants first challenge the Agencies' determination that an upgraded version of the existing two-lane highway "cannot satisfy the important project need of accommodating existing and projected traffic volumes." J.A. 450. The Agencies based this determination on general capacity figures for a hypothetical two-lane rural highway (the "Table 8-10 road") described in the *Highway Capacity Manual* (3d ed. 1994) ("HCM"), a professional treatise focusing on the design and operational analysis of highways. Appellants contend that the Agencies' analysis based on the Table 8-10 road was arbitrary and capricious because they failed to conduct an LOS analysis for the specific proposed two-lane alternatives. We conclude that under the circumstances, the Agencies' analysis was reasonable.

The Agencies used the Table 8-10 road to approximate the capacity of the proposed two-lane alternatives, in order to show that present and projected future traffic volumes on Route 9 far exceed the capacity of any two-lane highway over the same type of terrain. The HCM indicates that a highway like the Table 8-10 road could handle a maximum average daily traffic volume of 2,400 vehicles at an acceptable level of service. According to 1999 traffic data, the average daily traffic volumes on existing Route 9 within the project area range from 6,880 to 11,197 vehicles. In 2025, average daily traffic on this portion of Route 9 is projected to range from 10,826 to 17,619 vehicles.

Based on these figures, the Agencies concluded that "even assuming that improvements to the existing two-lane route could incrementally increase its capacity, any two-lane alternative would be seriously inadequate to meet existing and future needs for increased roadway capacity." J.A. 450. Given the large disparities between the capacity figures for the Table 8-10 road and existing and projected future traffic volumes on Route 9, we believe that the Agencies reasonably determined that further study of two-lane alternatives was unwarranted because such alternatives could not possibly meet the capacity needs of the project.[5]

B.

Appellants also contend that in forecasting future traffic volume, the Agencies improperly relied on growth assumptions for Jefferson County roads in general and did not adequately study future traffic growth specifically on Route 9. We disagree. In estimating future traf-

---

[5]Appellants assert that the Agencies' use of 2,400 vehicles per day as a capacity limit is misleading because that figure applies to mountainous terrain and only two of the relevant segments of Route 9 are mountainous. However, even under the capacity limits for rolling or level terrain at LOS "C"—5,200 and 7,900 vehicles per day, respectively—current traffic volume still exceeds capacity on most segments, and projected future volume exceeds capacity by a wide margin on all segments.

Appellants also contend that the proposed two-lane alternatives would provide more passing opportunities than the Table 8-10 road and therefore that these alternatives would meet capacity needs. We reject this argument. The 2,400 vehicle per day limit for the Table 8-10 road assumes that vehicles can pass on 40 percent of the highway, while the 7,900 vehicle per day limit for level terrain assumes that vehicles can pass on 80 percent of the road. Thus, even assuming *arguendo* that the proposed two-lane alternatives could provide *twice* the passing opportunities of the Table 8-10 road, the capacity of the upgraded two-lane highway would still be insufficient to handle present and projected future traffic volume at an acceptable LOS.

Further, Appellants claim that the proposed two-lane upgrades would also resolve existing safety problems on Route 9. Because we conclude the Agencies reasonably determined that the proposed two-lane upgrades would not meet the capacity needs of the project, we do not consider whether those improvements would adequately address safety issues.

fic volume, the Agencies obtained actual traffic data from Route 9 and then applied a growth factor derived from a statistical analysis of historical travel data for similar highways in Jefferson County. The growth factor used by the Agencies represents overall traffic growth of 57.36 percent between 1999 and 2025, or a compounded annual increase of approximately 1.76 percent. Actual measurements of traffic growth on Route 9 between 1975 and 1999 reflect an annual growth rate of approximately 2.2 percent, suggesting that the Agencies' estimate of future traffic growth was reasonable. In addition, the West Virginia University study from which the Agencies' growth factor was derived indicates that although the methodology used by West Virginia for projecting traffic volume on rural highways has certain shortcomings, it is at least as reliable as the methods used by other states for predicting traffic growth on similar roads. For these reasons, we find that the Agencies' analysis of future traffic volume was reasonable.[6] *See Johnson*, 165 F.3d at 289 ("Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to an agency's decision.").

### III.

In sum, we conclude that the Agencies' decision to exclude the proposed two-lane alternatives from more detailed consideration does not reflect "a clear error of judgment." *Id.* at 287 (internal quotation marks omitted). Because the Agencies reasonably rejected these alternatives as not meeting project needs, their analysis was sufficient under NEPA and Section 4(f). We therefore affirm the judgment of the district court.

*AFFIRMED*

---

[6]Appellants also challenge a district court order striking a declaration by one of their experts because it was not part of the administrative record and was not necessary to assist the court in understanding the record. We conclude that the district court did not abuse its discretion. *See Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998).