**THE WEST VIRGINIA HIGHLANDS CONSERVANCY, Plaintiff,**

v.

**Gale A. NORTON, Secretary of the Department of the Interior, and Jeffrey D. Jarrett, Director of the Office of Surface Mining; Defendants, and WEST VIRGINIA COAL ASSOCIATION, Intervenor–Defendant.**

No. CIV.A. 2:00–1062.

United States District Court,
S.D. West Virginia,
Charleston Division.

Jan. 9, 2003.

Joseph M. Lovett, John W. Barrett, Charleston, WV, James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, Suzanne M. Weise, Patrick C. McGinley, Morgantown, WV, for Plaintiff.

Michael L. Keller, Kasey Warner, United States Attorney's Office, Charleston, WV, Ruth Ann Storey, John Cruden, Thomas L. Sansonetti, Esquire, U.S. Department of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, for Defendants Norton and Jarrett.

Robert G. McLusky, Esquire, James R. Snyder, Esquire, Jackson & Kelly, Charleston, for Defendant–Intervenor West Virginia Coal Association.

## MEMORANDUM OPINION AND ORDER

HADEN, District Judge.

Pending is the motion of Plaintiff West Virginia Highlands Conservancy (WVHC) for summary judgment and a permanent injunction on *Count* 9 of its Second Amended and Supplemental Complaint. For reasons discussed below, the Court **DENIES** the motion without prejudice. Plaintiff's motion for summary judgment on approval by the Office of Surface Mining (OSM) of certain other state program amendments also pends. That motion is **GRANTED** in part and **DENIED** in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Surface Mine Control and Reclamation Act, 30 U.S.C. §§ 1201 *et seq.*, (SMCRA) requires each applicant for a mining permit to submit a reclamation plan in sufficient detail to demonstrate compliance with the reclamation standards of the applicable regulatory program. 30 U.S.C. § 1257(d). Before mining can begin, SMCRA and its implementing regulations further require the applicant to file a bond in an amount "sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture[.]" 30 U.S.C. § 1259(a); 30 C.F.R. § 800.14(b).

The statute allows an Alternative Bonding System (ABS): "[I]n lieu of the establishment of a bonding program, as set forth in this section, the Secretary may approve as part of a State or Federal program an alternative system that will achieve the objectives and purposes of the bonding program pursuant to this section." *Id.* at § 1259(c). Under the regulations, an ABS must "assure that the regulatory authority will have available sufficient money to complete the reclamation plan for any areas which may be in default at any time." 30 C.F.R. § 800.11(e)(1).

West Virginia has an ABS consisting, first, of a site specific penal bond, not less than $1000 nor more than $5000 per acre. *See* W. Va.Code § 22–3–11(a). In addition, the State has a Special Reclamation Fund (SRF), which is funded by a tax on clean coal mined in the state, forfeited bonds, interest income, and administrative penalties collected by the West Virginia Division of Environmental Protection (WVDEP).

Since 1988–89 the Office of Surface Mining (OSM) has known the State SRF lacked sufficient funds to reclaim all outstanding bond forfeiture sites. *See* 67 Fed.Reg. 37610 (May 29, 2002). In 1991 OSM notified the State that a program amendment was necessary to bring the ABS into conformity with SMCRA. In 1993 the State raised the per-ton tax from one to three cents. The fund remained in deficit. Finally, on June 29, 2001 and under pressure from this litigation, OSM issued a Part 733 notification[1] to the State that it was required to make statutory and regulatory revisions to conform the ABS to federal law. Otherwise, the Director would recommend the "Secretary of the Interior partially withdraw State program approval and implement a partial Federal regulatory program." (Admin. Record (AR), 2.)

In response, the WVDEP first proposed a plan called the "20/20 plan" that would raise the maximum per acre bonds to $20,000/acre and a 20 cents per ton tax. That plan was never presented to the Legislature, but was replaced by the "7–Up Plan," which increased the per ton tax to seven cents and added an additional increase of

---

1. 30 C.F.R. pt. 733; *see also* 30 C.F.R. § 732.17(f)(2).

seven cents per ton for a period not to exceed thirty-nine months. The plan also required that the four cent per ton increase, i.e., the seven-cents/ton basic tax, could not be reduced "until the special reclamation fund has sufficient moneys to meet the reclamation responsibilities of the state[.]" W. Va.Code § 22–3–11(h)(2) (2002).

Along with the tax provisions, the amended ABS plan passed by the Legislature, signed by the Governor, and submitted to OSM includes an Advisory Council. W. Va.Code § 22–1–17. The eight member council consists of the WVDEP Secretary, State Treasurer, director of the national mine land reclamation center at West Virginia University, and five members appointed by the Governor using recommendations from 1) industry, 2) environmentalists, and 3) the United Mine Workers Association, as well as 4) an economist or actuary, and 5) a member to represent the general public. *Id.* at (b).

The statute requires the Advisory Council to study the "effectiveness, efficiency and financial stability of the SRF," and contract with an actuary to determine the SRF's fiscal soundness on January 31, 2004 and every four years thereafter. *Id.* at (f)(2). The Council is charged to study and recommend to the Legislature alternative approaches to the current SRF funding scheme.[2] *Id.* at (f)(6). On January 1, 2003 and annually thereafter, the Council must submit a report to the Legislature on the adequacy and fiscal condition of the SRF, including a recommendation whether the tax needs to be adjusted. *Id.* at (g).

State program amendments cannot be implemented until OSM approves them. 30 C.F.R. § 732.17(g); W. Va.Code § 22–3–11(n). Following a public comment period, OSM approved the ABS program outlined above, so that the increased taxes could begin to be collected. The increase to 14 cents/ton was implemented January 1, 2002. But the agency bifurcated the decision process and reopened for public comment the question whether the amendments would "eliminate the deficit in [West Virginia's ABS] and ensure sufficient money will be available to complete reclamation, including the treatment of polluted water, at all existing and future forfeiture sites."[3] 67 Fed.Reg. 37611. Over Plaintiff's objections, the Court approved that bifurcated process. *WVHC v. Norton*, 190 F.Supp.2d 859, 870 (S.D.W.Va.2002).

On May 29, 2002, by notice in the Federal Register, OSM found the amendments to the State ABS would eliminate the Fund's $47.9 million deficit in about three years.[4] 67 Fed.Reg. 37613. Based on current coal production, the 14 cents/ton tax

---

2. Because the Advisory Council is required to "[s]tudy and recommend to the Legislature alternative approaches to the current funding scheme of the [SRF,]" W. Va.Code § 22–1–17(f)(6), OSM interprets this to mean that the Advisory Council cannot rely solely on a coal production tax, but "must examine and recommend other funding mechanisms such as a sinking fund, insurance, trust fund, or escrow accounts to meet future bond forfeiture reclamation obligations." 67 Fed.Reg. at 37614.

3. This required program amendment is set forth at 30 C.F.R. § 948.16(lll). A number of other program amendments at issue in this litigation are discussed *infra* at II.D.

4. OSM acknowledges this conclusion is called into question by its concession that Plaintiff WVHC correctly identified a substantial error in its calculations. Even assuming OSM was correct in projecting water treatment liability would increase by only $230,000 per year, its spreadsheet did not apply that assumption beyond 2004. With this correction, OSM's "basic conclusion remains the same. The Fund will eliminate the deficit and retain a positive balance *for a few years.*" 67 Fed.Reg. 37616 (emphasis added).

will increase cash flow into the SRF by about $1.8 million/month. *Id.* OSM earlier found these taxes would generate sufficient revenues to avoid deficit for about nine years, but future adjustments would have to be made to meet long-term needs of the SRF. *Id.* at 37611.

OSM recognizes "inaccuracies and gaps in the data currently available" on which these projections are based. *Id.* at 37613. For example, projected acid mine drainage ("AMD") costs are "gross estimates" only, *id.* and current estimates of the Fund's deficit may be in error, *id.* at 37614. If errors are found, "the Advisory Council must recommend changes to the Legislature and the Governor to assure that the deficit is eliminated in a timely manner." *Id.* OSM also acknowledges the Advisory Council recommendations do not ensure implementation because the Legislature and Governor must approve them before they take effect. For these reasons, OSM's approval of the ABS contains a caveat:

> In the event that the Legislature and the Governor do not approve the Council's recommendations, we will reevaluate the adequacy of the State's ABS and, if appropriate, provide notification to West Virginia under 30 CFR 732.17(c) and (e) that it must amend its program to restore consistency with Federal requirements. With this caveat, we are removing the required amendment at 30 CFR 948.16(lll).

67 Fed.Reg. 37614.

WVHC moved for summary judgment on *Count 9*,[5] which alleges OSM's approval of the State ABS program and its failure to respond adequately to Plaintiff's public comments were arbitrary, capricious, and inconsistent with SMCRA. WVHC requests the Court set aside OSM's approval and order OSM to take over the State's bonding program and to issue only site-specific, full cost bonds to cover the costs of reclamation. Plaintiff also requests the Court remand the bonding amendment to OSM with instructions to undertake immediately a full and complete site-specific analysis of all existing water and land reclamation liabilities, and then complete a thorough actuarial risk analysis of all State reclamation liabilities within two years. (Pl.'s Mem. in Supp. of Mot. for Summ. J.and Permanent Injunction at 26.)

## II. DISCUSSION

### A. *Standard of Review*

Under SMCRA, "[a]ny action subject to judicial review ... shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law." 30 U.S.C. § 1276(a)(1). Similarly, under the Administrative Procedures Act, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise inconsistent with law." 5 U.S.C. § 706(2)(A).

▮▮▮ When reviewing an agency's decision to determine if that decision was arbitrary and capricious, the scope of review is narrow. The reviewing court must decide if the agency's decision was based on consideration of relevant factors and whether there has been a clear error of judgment. *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287 (4th Cir.1999). The Court must scrutinize OSM's activity to determine "whether the record reveals that a rational basis exists

---

5. *Count 9* is found in the Second Amended and Supplemental Complaint, filed June 26, 2002. *Count 9* also alleges the remaining required program amendments are inconsistent with and less effective than SMCRA and its implementing regulations.

for its decision." *Natural Res. Def. Council, Inc. v. EPA,* 16 F.3d 1395, 1401 (4th Cir.1993). Agency action would be arbitrary and capricious if the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Hughes River,* 165 F.3d at 287–88 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). While the inquiry must be searching and careful, the Court is not empowered to substitute its judgment for that of the agency. *Id.* (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The parties have agreed there are no issues of fact and these matters may be decided solely as a matter of law.

### B. Alternative Bonding Systems

As explained above, under SMCRA site-specific bonds must be procured before mining begins and must be "sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture[.]" 30 U.S.C. § 1259(a); 30 C.F.R. § 800.14(b). OSM may approve an ABS "that will achieve the objectives and purposes" of the site-specific bond program. *Id.* at 1259(c).

The agency's regulations are essentially the same as the statute:

> OSM may approve, as part of a State or Federal program, an alternative bonding

system, if it will achieve the following objectives and purposes of the bonding program:

> (1) The alternative must assure that the regulatory authority will have available sufficient money to complete the reclamation plan for any areas which may be in default at any time; and

> (2) The alternative must provide a substantial economic incentive for the permittee to comply with all reclamation provisions.

30 C.F.R. § 800.11(e).

Regulations for determining the reclamation bond amount require it "[r]eflect the probable difficulty of reclamation, giving consideration to such factors as topography, geology, hydrology, and revegetation potential[.]" 30 C.F.R. § 800.14(a)(3). OSM's Handbook for Calculation of Reclamation Bond Amounts ("the Handbook") states that bond calculation should "reflect the 'worst case scenario,' *i.e.,* the cost of reclaiming the site if the permittee forfeits the bond at the point of maximum cost liability, under the reclamation and operation plans approved as part of the permit". (AR 668–69.)

### C. Is OSM's Finding the West Virginia ABS Achieves the Objectives and Purposes of the Site–Specific Bonding Program Arbitrary, Capricious or Otherwise Inconsistent with Law:

*WVHC's Objections and OSM's Responses*

■ WVHC complains the State ABS program OSM has approved is "obviously inadequate." By Plaintiff's account, OSM has abdicated its responsibility and relies on uncertain future actions by a virtually powerless advisory council, the Legislature and the Governor to assure the State program complies with federal law. Because OSM has approved the West Virginia ABS

based on inadequate and incomplete data, insufficient and incorrect analysis, and without considering recent changes to state reclamation standards, potential bankruptcies of major coal producers, or costs of reclaiming large mountaintop removal mining sites, WVHC contends OSM's decision cannot be deemed rational and must be disapproved.

According to WVHC, this "speculative, unsupported and incomplete methodology" contrasts with the requirement of site-specific bonding for a "careful pre-mining calculation of reclamation costs," which provides "certainty of funding." (citing 30 C.F.R. § 800.14). Plaintiff claims OSM only may approve an ABS that is fully sufficient, at the time of approval, to cover all potential defaults. OSM responds that "as long as the amendment provides a mechanism for remedying ABS inadequacies in a reasonable fashion, we can approve it as being consistent with 30 C.F.R. 800.11(e)." 67 Fed.Reg. 37614. WVHC counters that an ABS must assure adequate funding, not just provide a " 'mechanism' for future elimination of the deficit and attainment of Fund solvency." (Pl.'s Mem. at 12.)

Within this general framework, WVHC raises a number of specific objections to the data and methodology OSM employed in reaching its decision to approve the West Virginia ABS. The Court proceeds by considering the specific objections and then placing them in context within the broader, more general concerns summarized above.

## 1. Future Water Treatment Cost Estimates

OSM's projection of future water treatment costs, the Fund's largest potential future liability, is also the parties' most substantial area of disagreement. The parties agree on one point: water treatment for pollutional discharges, including AMD, is a perpetual requirement. Initially, WVDEP used a figure of approximately $25 million as the cost for ongoing water treatment at active mine sites, then presumed a worst case scenario would incur a ten percent forfeiture rate. (AR 624–26.) On that basis, WVDEP proposed $2.46 million should be added annually as the projected water treatment costs. OSM rejected this projection, because it assumes that "almost all permits where acid mine drainage were being treated would be forfeited." 37 Fed.Reg. 37615. Instead, OSM used the historical figure for bonds forfeited in West Virginia that included water treatment costs of approximately $4.6 million over the twenty-year period, thus projecting an average annual increase of $230,000 per year.[6] *Id.* An additional consideration is whether sites with AMD are increasing. OSM represents that there is a declining trend from 1982 to 1996 in sites developing AMD. OSM agrees with WVHC, however, that the uni-

---

**6.** Because of the difficulty in determining these costs and guaranteeing their future payment, OSM notes it recently published in the Federal Register an Advance Notice of Proposed Rulemaking seeking comments on what types of financial guarantees will best ensure adequate funding for the treatment of unanticipated long-term pollutional discharges, including acid or toxic mine draining, that develop as a result of surface coal mining operations. 67 Fed.Reg. 35070 (May 17, 2002); 67 Fed.Reg. 46617 (July 16, 2002).

In response to OSM's discussion of these difficulties, Plaintiff claims OSM asserts " 'the creation of an adequate bonding system' is 'infeasible,' indeed 'impossible,' to attain in states like West Virginia where long-term acid mine drainage has been created by mining operations." (Pl.'s Reply Mem. at 3 (quoting Fed. Defs.' Mem. at 7)). This quote is inaccurate. OSM said, "it is simply impossible to determine, at this moment, how much revenue is needed to pay for all reclamation costs, including water treatment, into infinity."

verse of sites with AMD has grown since 1982 and therefore:

> the reliance on historic data may not be the best tool for evaluating long-term needs. We agree that there is a need for more data and a rigorous data analysis. The State program amendment that we approved ... provides for such actions through the tasks assigned to the Advisory Council.

*Id.* at 37616.

WVHC cites other problems with the water treatment cost projections to which OSM's responses are also noted:

! OSM relied on samples taken during the driest month of a record drought year. OSM counters the low flow raises treatment costs, so by using that data, it overstated estimated costs. 67 Fed. Reg. at 37617.

! OSM underestimated treatment costs by assuming existing treatment meets required Clean Water Act effluent standards, but at numerous sites, it does not. OSM responds WVHC is correct, but the data were used only to obtain "gross costs estimates for the entire universe of pollutional discharges at bond forfeiture sites." *Id.* at 37619.

! WVDEP limited treatment costs to passive treatment costs. OSM responds that is incorrect and, at any rate, passive systems may be used if funds are provided for continued maintenance and replacement. *Id.* at 37619.

! OSM and WVDEP improperly deleted active sites from the AMD inventory. OSM answers sites were only deleted from the active inventory if found to have no pollutional discharges, or moved to the bond forfeiture inventory if the permit was revoked. *Id.*

! OSM failed to reconcile Tetra Tech's calculation that long-term water treatment costs would be $2.6 billion after fifty years with WVDEP's estimate of less than $10 million per year. According to OSM, the Tetra Tech analysis was not intended to produce a valid cost for water treatment, but the calculations were "instead illustrative of the use of a methodology" and "did not reflect final determinations of unfunded costs." *Id.* at 37620.

Even if the current projections of water treatment costs prove to be inaccurate, OSM disagrees with WVHC that the funding problem for future water treatment would be solved by site-specific bonds. According to the OSM Handbook, AMD is characterized as an unanticipated cost:

> The initial calculation of bond amounts will not include remediation costs for events such as acid mine drainage and landslides that are not anticipated in the approved permit or reclamation plan. Should an unanticipated event occur, the regulatory authority must require a permit revision and adjust the bond amount to include any additional reclamation costs.

(AR 669.) When the AMD occurs, bond adjustment is required and authorities then face the dilemma of calculating an adequate, sum certain amount of money to satisfy a perpetual liability. (Fed. Defs.' Mem. in Opp'n at 9 n. 5.) In this regard, site-specific bonding and the State ABS do not differ: the harm has occurred, but the money to rectify the problem must be determined, and collected, and may not be guaranteed.

This thumbnail summary of the parties' disagreement about projected water treatment costs reveals several aspects of the debate and the questions raised for the Court. Numerous technical considerations underlie these calculations and projections. The data employed currently is inadequate. OSM acknowledges this repeatedly.

! As noted by some commenters, we recognize that there are inaccuracies and gaps in the data currently available. We are continually revising our acid mine drainage inventories. . . . Projected treatment costs at this time are gross estimates based on water treatment models, rather than individual site-specific designs of treatment systems. . . . To the extent that resources allow, we intend to work with WVDEP to assist the Advisory Council in obtaining the data it will need to do its job. 67 Fed. Reg. 37613.

! We agree that there is a need for more data and a rigorous data analysis [concerning AMD sites]. 67 Fed.Reg. 37616.

! We recognize that the current estimate of treatment costs is based on very limited data and a formula for estimating costs. WVDEP needs to collect data showing seasonal variation at sites requiring water treatment, and it must increase staff or hire contractors for site-specific designs of those treatment systems. *Id.*

! We concur that the new Advisory Council must gather data and evaluate the adequacy of the Fund's ability to cover water treatment. *Id.*

! Program liability cost estimates [for water treatment], derived from current WVDEP inventory data, are at best gross estimates that may either underestimate or overestimate the actual program liability costs. . . . However, we believe that WVDEP's inventory data will improve significantly over time as WVDEP gains new knowledge and experience and as it identifies the costs associated with planning, developing, installing, and treating bond forfeiture sites with AMD. *Id.* at 37617.

This is a partial compilation of OSM's acknowledgements that the available data on which its decision must be made are incomplete, insufficient, gross estimates, and model-driven projections. Further, OSM agrees its analysis is "not a substitute for an objective, professional, and rigorous actuarial analysis of the Fund and its reclamation obligations and costs." *Id.* at 37615.

Nonetheless, OSM advances two justifications: (1) WVDEP will continue to improve its data on current costs and estimates of future bond forfeiture land and water reclamation costs and (2) the Advisory Council is required by law to contract for an actuarial analysis on a regular basis, the first to be completed by December 31, 2004. Because that date corresponds with the approximate time the SRF deficit will be eliminated by the enacted tax increases, *see id.,* the professional actuarial analysis will be timely. Either the deficit will be eliminated or the Advisory Council can propose further remedial action.

Review of this debate shows OSM has responded to each concern raised by the commenters. While frequently acknowledging the truth of the commenters' observations, OSM nevertheless demonstrates the numbers used or projections made are rationally calculated and reasonable, based on agency expertise. There is pair of underlying presumptions, that WVDEP will improve its data collection and the quality of the data collected, while the Advisory Council will perform its statutory duties and recommend tax increases and alternative funding mechanisms, if needed. Part of the remedy Plaintiff seeks is that the Court order OSM to assume these duties, which are already mandated to be performed by State officials. The Court must accept the presumption that public officials will carry out their official duties lawfully, with appropriate dispatch and expertise, despite the previous noncompliance noted in *West Virginia Highlands Conservancy*

*v. Norton,* 161 F.Supp.2d 676, 681–83 (S.D.W.Va.2001).

Which figures will best predict water treatment costs into the indefinite future is obviously an exercise requiring geotechnical and actuarial skills as well as extensive data. WVHC offers one account; OSM responds with a different, but reasonable, determination. OSM acknowledges the need for more data and continued adjustment of the liability projections. The Court, too, would wish more certainty as to whether the current tax increase will solve the Fund's fiscal problems. But where it is not apparent the agency has been unreasonable, and its current approach is plausible, the Court must defer to the agency.

**2. Land reclamation costs**

The situation with regard to land reclamation cost projections parallels the issues raised concerning water treatment. For example, WVHC claims OSM underestimated liabilities; OSM responds that, while acknowledging the need for better data, the current estimate represents the best estimate available. OSM acknowledges money already spent on sites where reclamation is not complete was not included in the per-acre reclamation figure, but conversely, not all currently disturbed acreage will require backfilling and grading, the most expensive component of land reclamation.

Similarly, WVHC raised objections to calculations and projections to which OSM responded:

! Reclamation costs at three sites alone (Omega, T & T, and Royal Scot) exceed the State's entire $27.9 million estimate for all land reclamation. OSM responds land reclamation at Omega is completed, T & T land reclamation liability is $105,000 and Royal Scot is $6.2 million. 67 Fed.Reg. at 37621.

! The *Bragg*[7] consent decree will increase significantly future land reclamation costs. According to OSM, limits on the extent of disturbed area and spoil placement under the consent decree will help control reclamation liability post-*Bragg. Id.*

! The last three-year average net land liability figure of $3.9 million is inadequate and unjustified, particularly when year 2000 liability alone was $6.1 million. OSM answers the $3.9 million is the difference between the amount of the bond and the accrued liability for the permits revoked during a one-year period based on a three-year average. This historical rate on an annual basis is a good reference for future projections. Also, the average shortfall for the past five years was $4.3 million, making the State's estimate of $3.9 million reasonable. *Id.* at 37622.

! Historic costs are an inadequate basis for extrapolation because mountaintop removal (MTR) mines will greatly increase land reclamation costs. OSM agrees historic figures do not represent potential forfeiture costs for a large MTR mine, but believes that vigorous enforcement of contemporaneous reclamation requirements and site-specific bonds up to the $5,000 per acre limit will control costs and encourage reclamation. *Id.* at 37623.

! The potential failure of a large mining company could be catastrophic producing massive reclamation liabilities. OSM replies such a failure might not mean the forfeiture of all its permits. Also failure of these large consolidated companies is less likely than the smaller undercapitalized ones generally forfeiting bonds. Finally, the Advisory Coun-

---

**7.** *Bragg v. Robertson,* 83 F.Supp.2d 713 (S.D.W.Va.2000).

cil will need to study these potential risks. *Id.*

! WVDEP failed to consider costs of reclaiming to the new commercial forestry standards nor deleting the older, less demanding requirements. In response, OSM relies particularly on the mechanism for future adjustments in revenues via the Advisory Council while noting that only a limited number of MTR mines will elect the forestry option. *Id.* at 37624.

As with the water treatment cost debate, WVHC makes good points and OSM provides reasonable responses. Each potential problem raised by Plaintiff has been addressed and the proffered answers are not implausible. Again and ultimately, the Court must defer to the agency's expertise.

### 3. Role of the Advisory Council

Plaintiff objects that OSM used the wrong legal standard in approving the amendment. OSM found that "the amendment provides a mechanism for remedying ABS inadequacies in a reasonable fashion." *Id.* at 37614. WVHC counters that OSM's reliance on the Advisory Council "mechanism" for future deficit elimination and fund solvency is inconsistent with SMCRA, section 1259, which requires certainty of funding: "The amount of the bond shall be sufficient to assure the completion of the reclamation plan[.]" 30 U.S.C. § 1259(a). Providing a mechanism to handle these problems "does not provide the equivalent certainty of funding of a site-specific system." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 14.)

Under the enabling regulation, an alternative bonding system "must assure that the regulatory authority will have available sufficient money to complete the reclamation plan for any areas which may be in default at any time." 67 Fed.Reg. 37614 (citing 30 C.F.R. § 800.11(e)). As OSM points out, the requirement is that sufficient money "be available," when there is a default and the areas must be reclaimed. The regulation does not require the money be available immediately. Further, the agency explains, even if somehow money could be made available immediately, manpower, machinery, logistics, planning and letting contracts would make it impossible to perform immediate reclamation on all areas currently in default.

This reading of the statute and regulation is plausible. Even a site-specific bond system will not set aside earmarked reclamation funds, but instead guarantees the bonding agency will draw on its sources of funds, and that they will be adequate, if and when such withdrawals become necessary. Similarly, the West Virginia ABS sets aside tax (and other) monies at a rate projected to provide and guarantee sufficient funds for reclamation when needed. The current deficit is evidence of an inadequate rate, but not the inability of an ABS structured like that of West Virginia to provide sufficient funds, when needed. The inadequacy can be corrected by an adequate rate increase and a mechanism to ensure the rate keeps pace with reclamation needs, once the deficit is eliminated. Such a mechanism requires: improved data as to site-specific reclamation needs and default rates; ongoing reports of the SRF's fiscal condition; and actuarial analyses projecting the balance between reclamation needs and funds. The Advisory Council can provide all of these. The only thing it cannot do is adjust the rates; only the Legislature can adjust the tax rates. Again, however, the Court cannot assume the State authorities will not adjust rates when and if it becomes necessary. The current adjustment more than doubled the permanent tax rate and redoubled the rate for 39 months, both substantial increases,

which evidences resolve to comply with the legal requirements at issue.

The required program amendment must eliminate the deficit in the ABS and *"ensure* that sufficient money will be available to complete reclamation, including the treatment of polluted water, at all existing and future bond forfeiture sites." 30 C.F.R. § 948.16(lll) (emphasis added). WVHC argues Section 1259 mandates a detailed and comprehensive process that assures adequate money will be promptly available if a bond forfeiture occurs. (Pl.'s Mot. for Summ. J. at 10.) Site-specific bond calculation requires calculation of "the probable difficulty of reclamation, giving consideration to such factors as topography, geology, hydrology, and revegetation potential[.]" 30 C.F.R. § 800.14(a)(3). Such bonds must be adjusted where the bonded area increases or decreases or "where the cost of future reclamation changes." *Id.* at § 800.15(a). As discussed above, AMD is not an anticipated condition, so bonds must be adjusted when water treatment becomes necessary during mining. When mining-related water pollution occurs and perpetual treatment is necessary, the same uncertain calculations are required to adjust the site-specific bond as the ABS must make. For these reasons, according to OSM, "Estimating bond forfeiture rates and long-term water treatment obligations is a very speculative endeavor." 67 Fed.Reg. at 37615. "[T]here is simply no means to calculate a sum certain bond amount to cover the costs of perpetual AMD treatment."[8] (Defs.' Mem. in Opp'n at 9.) Site-specific bonding,

therefore, does not provide additional guarantees or upfront assurances that sufficient money will be available for reclamation. Both the site-specific and alternative bonding systems must project estimated costs into an uncertain future.

WVHC proposes that OSM's argument is simply a claim that statutory compliance is impossible, a claim courts frown upon. (Pl.'s Mem. in Reply at 4 (citing *NRDC v. Train,* 510 F.2d 692, 713 (D.C.Cir.1974)).) As the discussion above explains, however, OSM does not claim impossibility, but rather equivalent difficulty under both the original statutory system and its alternative.

Given these difficulties, OSM argues there is only one way to "ensure" a continuous, flexible stream of revenue to fund AMD and land reclamation costs in the future, considering the fluctuations in those costs due to factors such as higher postmining land use requirements, large company defaults, consolidation of companies, more stringent thresholds for determining approximate original contour, and compliance with Clean Water Act effluent limitations. The avenue to solution is increased tax collection in a system with a built-in adjustment mechanism so that, as these factors change, the tax rate can be incrementally adjusted. (Defs.' Mem. in Resp. at 13). The Advisory Council is the ABS's adjustment mechanism.

The new ABS does not differ in principle from the site-specific bond program, which also requires adjustment as conditions

---

8. In its reply, WVHC asserts that OSM administers a federal site-specific bonding program in Tennessee under which it calculates bonds sufficient to cover the cost of perpetual AMD treatment. (Pl.'s Mem. in Reply at 4 n. 2, 7.) OSM replies, however, that it lacks statutory authority to establish interest-bearing accounts for any forfeited bonds and must therefore adjust and increase bond amounts

sufficient only for a finite amount of time. In any event, no such temporally-limited bond increases have ever been submitted in Tennessee, due to administrative challenges to the Interior Board of Land Appeals, as well as litigation filed by the National Mining Association regarding the legality of requiring bonds to cover the cost of AMD treatment. (Defs.' Surreply at 2.)

change and unforeseen difficulties arise. OSM's approval of the West Virginia ABS, based in part on the addition of the Advisory Council and the statutory requirements for data collection, reporting, and advice to the Legislature is not unreasonable or implausible.

**4. OSM's Approval is not Arbitrary, Capricious, or Inconsistent with Law, but it is Contingent and Conditional**

The Court has reviewed each of Plaintiff's objections and concluded that OSM's responses, calculations, and projections are based on reasonable consideration of the relevant factors. While experts on either side differ, OSM has not provided any explanation so implausible that it could not be ascribed to differences of opinion, possibly compounded by the difficulties inherent in projecting scenarios incorporating new and untested variables. New mountaintop removal mining standards, industry consolidation, potential large-scale bankruptcy, and the current uncertainties of the bond market are some of the unknowns that may skew projections from historical data.

While better data that Plaintiff demands might sharpen the calculations, the surest test will be whether OSM's predictions play out in the near future. The increased tax at 14 cents per ton has been collected for a year. The first statutory deadline has passed: On January 1, 2003 and annually thereafter, the Advisory Council must submit a report to the Legislature on the adequacy and fiscal condition of the SRF, including a recommendation whether the tax needs to be adjusted. W. Va.Code § 22–1–17(g). The Court has not been informed whether this deadline was met. The Council's reports will establish if OSM's projections are correct that the SRF deficit is being reduced at a rate putting it on target to disappear in two more years.

The ultimate question is whether the ABS as now constituted will work. Will it "eliminate the deficit in the ABS and ensure that sufficient money will be available to complete reclamation, including the treatment of polluted water, at all existing and future bond forfeiture sites" as the amendment OSM is approving requires? 30 C.F.R. § 948.16(lll). The ABS can work if the Advisory Council evaluates the Fund's fiscal situation, makes recommendations as necessary, and the Legislature and the Governor enact those recommendations. As all are aware, the question is, if more money is needed, will a sufficient tax hike be passed, *i.e.*, will the mechanism work? That is the question OSM also left open:

> In the event that the Legislature and the Governor do not approve the Council's recommendations, we will reevaluate the adequacy of the State's ABS and, if appropriate, provide notification to West Virginia under 30 CFR 732.17(c) and (e) that it must amend its program to restore consistency with Federal requirements. With this caveat, we are removing the required amendment at 30 CFR 948.16(lll).

67 Fed.Reg. 37614.

A caveat is a caution, a warning enjoining against certain practices. Webster's Third International Dictionary (Merriam–Webster 1981). OSM approves the West Virginia ABS only conditioned upon this caveat and contingent upon the State following the Advisory Council recommendations. This is an important caveat because, as Plaintiff explains, the Advisory Council is powerless. OSM is not powerless, however, to right the situation if the State does not. Again the Court defers to the agency's expertise. While OSM's finding the ABS is sufficient at this time is not arbitrary nor capricious, neither is OSM's concern that the mechanism may not be

allowed to work. For this reason, the Court also must condition its conclusion because if the Council is powerless and OSM does not exert its power, the Court would then be called upon to enforce the law.

Plaintiff's motion for summary judgment on *Count* 9 is **DENIED without prejudice** and the motion for injunctive relief is **DENIED** as moot. If OSM removes the caveat and unconditionally approves the ABS, the reasonableness of that action may be contested. Alternatively, either party may raise anew *Count* 9 on the grounds the caveat was warranted and the Advisory Council's recommendations are not being followed.

### D. The Remaining Amendments

WVHC also challenged OSM's approval of certain non-bonding program amendments, codified at 30 C.F.R. §§ 948.16(dd), (tt), (xx), (nnn), (*ooo*), (sss), (vvv(2)), (iiii), (nnnn), and (*oooo*).

### 1. Amendments satisfied by policy statements or guidelines

■ A state may assume regulatory jurisdiction over surface coal mining and reclamation in the state only if it has an approved State program that includes "a State law which provides for the regulation of surface coal mining and reclamation operations in accordance with the requirements of [SMCRA]" and "rules and regulations consistent with regulations issued by the Secretary pursuant to [SMCRA]." 30 U.S.C. §§ 1253(a)(1), (a)(7). Plaintiff objects to OSM's approval of eight of these amendments because WVDEP proposed *policies* and *guidelines,* rather than changes in State law or regulations, to remedy the problem OSM had previously identified.

For example, 30 C.F.R. § 948.6(dd) requires, in part, that West Virginia "must submit proposed revisions to Subsection CSR 38–2–9.3 of its Surface Mining Reclamation Regulations or otherwise propose to amend its program to establish productivity success standards for grazing land, pasture land and cropland[.]" In response, WVDEP developed a policy using productivity standards developed by the Natural Resources Conservation Service and other publications of the United States Department of Agriculture. 67 Fed.Reg. 21904, 21905 (May 1, 2002). OSM approved the amendment "because the proposed policy establishes productivity success standards ... that are no less effective than those standards set forth in 30 C.F.R. 816.116 and 817.116[.]" *Id.* at 21906.

WVHC objects that WVDEP's rules must be promulgated in accordance with the West Virginia Administrative Procedures Act (APA), W. Va.Code § 29A–1–1, *et seq.* The State SMCRA program requires that any forms, handbooks or similar materials having the effect of a rule are subject to the State APA. *See* W. Va.Code § 22–3–4(b)(1). The policies WVDEP offers to amend its state program were not so promulgated.

If a rule affects private rights, privileges or interests, it is a legislative rule and must be promulgated according to APA procedures or it "remains a nullity providing no one with a clear legal right to judicial relief." *See* W. Va.Code § 29A–1–2(i); Syl. pt. 1, *Wheeling Barber Coll. v. Roush,* 174 W.Va. 43, 321 S.E.2d 694 (1984). On the other hand, interpretive rules "do not create rights but merely clarify an existing statute or regulation." *Appalachian Power Co. v. State Tax Dep't,* 195 W.Va. 573, 583, 466 S.E.2d 424, 434 (1995); *see also* W. Va.Code § 29A–1–2(c). "Although they are entitled to some deference from the courts, ... interpretive rules do not have the force of law nor are

they irrevocably binding on the agency or the court[.]" *Id.* By allowing WVDEP to regulate surface mining by policy, WVHC argues, OSM is arbitrarily and capriciously sanctioning a practice that eviscerates the citizen enforcement provisions of SMCRA.

OSM responds the issue is whether West Virginia's surface mining *program* is consistent with the requirements of SMCRA. (Fed. Defs.' Mem. in Opp'n at 21–22 (citing 30 C.F.R. § 732.15 ("The Secretary shall not approve a State *program* unless, ... [t]he *program* provides for the state to carry out the provisions and meet the purposes of this Act.")).) OSM has determined West Virginia's proposed amendments, "albeit consisting of augmentative policies and guidelines, are consistent with SMCRA and achieve the goal of overall program consistency." *Id.* at 22. Because "it is the states, not the federal government, that are to 'develop and implement a program to achieve the purposes of [SMCRA],'" *Bragg v. West Virginia Coal Ass'n,* 248 F.3d 275 (4th Cir. 2001), the Court should defer to OSM's decision granting the State latitude to carry out its own program.

Neither party has submitted any authority explicitly addressing the issue of whether a State program may include augmentative policies and guidelines that do not have the force of law. OSM cites *Alternate Fuels, Inc. v. Lujan,* 1992 WL 279743 (D.Kan.1992), finding OSM's approval of Kansas revegetation standards for surface coal mining was not arbitrary or capricious although the standards were embodied in guidelines. *Alternate Fuels*

does not specifically address the issue whether guidelines, which are not law or regulation, may be part of a State program. Nor does it consider requirements under Kansas surfacing mining law for rule-making approval of such guidelines.

A "State program" is defined as "a program established by a State and approved by the Secretary pursuant to section 503 [30 U.S.C. § 1253] of the Act to regulate surface coal mining and reclamation operations ... within that State, according to the requirements of the Act and this chapter." 30 C.F.R. § 701.5. While Section 503 requires that State law, rules and regulations be capable of carrying out the provisions of SMCRA, it does not require only rules and regulations comprise the State program.[9] "Program" is thus open and not limited as to its extent or its composition. OSM has interpreted the term to include laws, rules, policies and guidance documents. 67 Fed.Reg. 21923. The agency points out that all portions of a program are subject to public review and comment and require OSM approval. *Id.* State program amendments include any "alterations" in the State program, according to OSM. *Id.* (citing 30 C.F.R. § 732.17(a)). OSM further instructs:

> If a State regulatory authority submits a policy, technical guidance, or written statement as a means of rendering the State program no less effective than the Federal regulations, that policy, technical guidance, or written statement, if approved by OSM, becomes part of the approved State program. If, after approval by OSM, the policy, technical

---

9. Section 503, 30 U.S.C. § 1253, provides for the initial approval of a State surface mining program, during "the eighteenth-month [sic] period beginning on August 3, 1977[.]" 30 U.S.C. § 1253(a). The statute does not speak to approval of amendments of previously approved State programs, which is dealt with by OSM regulation at 30 C.F.R. § 732.17.

WVHC argues OSM failed to make findings required by §§ 732.15(b)(6) and (d). These findings relate to initial approval or disapproval of State programs under § 732.15, not their amendment under § 732.17 and are not required for program amendment.

guidance, or written statement subsequently changed [sic], it should be submitted to OSM as a State program amendment.

*Id.*

■ The Supreme Court has continually reaffirmed that an agency's interpretation of its own regulations is entitled to substantial deference. *See, e.g., Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations."); *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) ("[P]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."). The deference applies only to the extent the agency's rules are not contrary to the statute or regulation, and that question is one of law for the courts to determine *de novo.* *See Public Employees Retirement System v. Betts,* 492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989) (no deference due agency interpretation at odds with the statute).

As noted above, the statute does not limit the contents of a State program and it does not address State program amendment. Program amendment is addressed by agency regulations. OSM interprets a State program to include agency policies and guidance documents. This interpretation is not plainly erroneous or inconsistent with the regulation. Accordingly, the Court **DENIES** WVHC's motion to disapprove OSM's approval of West Virginia's amendments to its State program on the basis they are achieved through policy statements and guidance documents.

## 2. Inconsistent State law found consistent through preemption

■ OSM also determined four amendments, codified at 30 C.F.R. § 948.16(nnn), (ooo), (sss) and (oooo), were no longer required and could be removed. For example, the West Virginia statute includes unjust hardship as a criterion to support the granting of temporary relief from an order or other decision issued under the West Virginia Surface Coal Mining and Reclamation Act. W. Va.Code § 22B–1–7(d). Although WVDEP proposed an amendment to the West Virginia Code that was submitted to the Legislature, the proposal died in committee. 67 Fed.Reg. 21911. According to OSM, the current state statutory language is inconsistent with Sections 514(d) and 525(c) of SMCRA.

Nevertheless, OSM now reasons no amendment is necessary because the Supreme Court of Appeals of West Virginia has held that "When a provision of the West Virginia Surface Coal Mining and Reclamation Act ... is inconsistent with Federal requirements in [SMCRA], the State Act must be read in a way consistent with the Federal Act." *Canestraro v. Faerber,* 179 W.Va. 793, 374 S.E.2d 319 (1988). The State Supreme Court also held that proposed changes to approved State programs do not take effect until approved as an amendment by OSM. *See DK Excavating, Inc. v. Miano,* 209 W.Va. 406, 409, 549 S.E.2d 280, 283 (2001). Finally, that court held state surface mining regulations must be read in a manner consistent with federal regulations enacted in accord with SMCRA. *Charles Schultz v. Consolidation Coal Co.,* 197 W.Va. 375, 475 S.E.2d 467 (1996). Based on these principles, OSM removed the four amendments at issue, declaring them satisfied.

According to OSM, because it has never approved the regulatory language at issue in the four amendments, that language has

never taken effect. Moreover, under West Virginia Supreme Court case law interpreting federal law, state surface mining law must be read to be consistent with federal law. Therefore, although the language required to be amended is inconsistent with federal law, and OSM has declared it inconsistent with federal law, the amendments are no longer required because *by law* the State law is a nullity.

This Court previously considered this problem in *West Virginia Highlands Conservancy v. Norton*, 190 F.Supp.2d 859, 871 n. 9 (S.D.W.Va.2002). When WVDEP failed to respond to the required amendment at § 948.16(*oooo*), OSM defended the State agency action, arguing the failure had no legal consequences because the regulation was not law under the principles of *Canestraro, Schultz,* and *DK Excavating,* and so leaves no "hole" in the State program. *Id.* The Court found there were legal consequences because the State regulations contained not a hole, but a "hump," a regulation that is not law. The resulting regulations were "confused, inaccurate, and misleading." *Id.*

Concerning the four amendments at issue here, which include (*oooo*), OSM now responds it is not charged with the task of ensuring that West Virginia's program is a model of clarity. (Fed. Defs.' Mem. in Opp'n at 23.) Rather, OSM is charged with ensuring the West Virginia program remains consistent with the federal scheme.

The West Virginia program is not consistent with the federal scheme in four areas noted by the required amendments at § 948.16(nnn) (West Virginia allows unjust hardship criterion); 948.16(*ooo*) (W. Va.Code § 22B–1–7(h) states the Environmental Quality Board hears appeals from actions taken under the State surface mining board; this is incorrect); § 948.16(sss) (State law and regulations allow waiver for

replacement of water supplies that cannot be waived); and § 948.16(*oooo*) (State regulations allow special authorization for coal extraction incident to land development; federal law does not).

OSM's finding the four amendments have been satisfied because inconsistent State law is preempted by federal law allows a state program to directly contradict federal law and yet be "consistent" with federal law. This is not rational or logical, but arbitrary. By this reasoning, a state program could contain any number of misstatements and misrepresentations of required federal surface mining law, yet by the operation of law, those areas would be replaced *sub silentio* with the correct law, which could be determined only by investigation of the Federal Register to ascertain which amendments OSM had not approved due to inconsistency, but allowed to remain in State law because OSM nevertheless declared it "consistent."

Under this system, the entire State surface mining law, statutes and regulations, would give the appearance of law but would have no effect. Application of each such apparition of law would require due diligence to determine its existence or counterpart in federal law. This undertaking is the duty imposed by statute and regulation on the agency. 30 U.S.C. § 1253(a)(1) and (7); 30 C.F.R. § 732.15. If State surface mining law is not consistent with federal law, OSM must require the State to amend it and may not arbitrarily and irrationally declare what is inconsistent to be consistent.

For these reasons, the Court **GRANTS** summary judgment for WVHC on its claim that OSM's approval of the four amendments required at § 948.16(nnn), (*ooo*), (sss), and (*oooo*) is arbitrary, capricious and inconsistent with law. That agency decision is **VACATED** and the four amendments are remanded to OSM for

reconsideration of its decision consistent with the requirements of SMCRA under the timetable provided in 30 C.F.R. § 732.17(f)(1) and (2).

### III.  CONCLUSION

WVHC's motion for summary judgment on *Count* 9 of the Amended and Supplemental Complaint is **DENIED** without prejudice.  Plaintiff's motion for summary judgment on OSM's approval of State program amendments based on policy or guidance statements is **DENIED**.  Plaintiff's motion for summary judgment on OSM's approval of State program amendments inconsistent with federal law because OSM finds them consistent through operation of law is **GRANTED**.  OSM approval of the four amendments at § 948.16(nnn), (*ooo*), (sss), and (*oooo*) is **VACATED** and the amendments are remanded to OSM for reconsideration in light of this opinion and federal law.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and post it on the Court's website at http://www.wvsd.uscourts.gov.